**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RIVER LIGHT V, L.P. and
TORY BURCH LLC,

               Plaintiffs,

     v.

LIN & J INTERNATIONAL, INC.,
YOUNGRAN KIM, LJ BRAND, INC., and
NJ LIN & J INTERNATIONAL, INC.,

               Defendants.

ELECTRONICALLY FILED

1:13-cv-03669 (DLC)


Filing Date:
October 2, 2014


**DEFENDANTS' MEMORANDUM OF LAW**
**IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**


HOWARD Z. MYEROWITZ, ESQ. (HM0972)
HMyerowitz@SongLawFirm.com
Song Law Firm, LLC
400 Kelby Street, 7th Floor
Fort Lee, New Jersey, 07024
Tel:     (201) 461-0031
Fax:     (201) 461-0032
Attorneys for Defendants

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………...………………… ii

PRELIMINARY STATEMENT……………………………………………...................... 1

COUNTER-STATEMENT OF FACTS………………………………………………..... 2

    A.  Prior Uses of the Isis Cross Design...................................................................... 2

    B.  Tory Burch's Logos and Crosses....................................................................... 3

    C.  Lin & J Develops the Isis Cross Design........................................................... 5

    D.  Tory Burch and Lin & J Do Not Compete........................................................ 6

    E.  Tory Burch's Campaign of Intimidation and Litigation against Lin & J....................... 8

LEGAL STANDARD........................................................................................ 11

ARGUMENT
A.  Questions of Fact Regarding Counterclaims Preclude Entry of Summary Judgment    11

    1.  Entry of Summary Judgment on Defamation Is Inappropriate..................................... 12

    2.  Entry of Summary Judgment on Tortious Interference Is Inappropriate....................... 14

    3.  Entry of Summary Judgment on Abuse of Process Is Inappropriate............................ 15

B.  Questions of Fact Regarding Counterfeiting Preclude Entry of Summary Judgment......... 16

    1.  At a Minimum, There Is a Question of Fact as to Whether Defendants
        Have Counterfeited the "Tory Burch" Word Mark........................................................ 17

    2.  At a Minimum, There Is a Question of Fact as to Whether Defendants Have
        Counterfeited Products Bearing the T over T Logos...................................................... 18

C.  Questions of Fact Regarding Trademark Infringement Preclude
    Entry of Summary Judgment.............................................................................. 22

    1.  Likelihood of Confusion Standard……………………………………...................... 22

    2.  Validity and Strength of the Plaintiff's Marks……………………….......................... 23

    3.  The Alleged Similarity of the Marks…………………………………….................. 25

4.   The Lack of Competitive Proximity of the Products in the Marketplace…………….   28

5.   Whether Plaintiff Will "Bridge the Gap"……………………………………….........   30

6.   Lack of Evidence of Actual Confusion……………………………………….........   31

7.   Bad Faith……………………………………………………………………….........   33

8.   The Disparate Quality of the Parties' Products……………………….................   35

9.   Consumer Sophistication……………………………………………………….........   36

10. Cause of Minimal Confusion...........................................................................................   38

CONCLUSION……………………………………………………………………………   38

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*3M Co. v. Mohan*
Case No. 09-1413, 2010 WL 5095676 (D. Minn. Nov. 24, 2010).............................17, 18

*Aequitron Med. v. Dyro*
999 F. Supp. 294 (E.D.N.Y.1998)..............................................................................13

*Arrow Fastener Co., Inc. v. Stanley Works*
59 F.3d 384 (2d Cir. 1995)..............................................................................23, 29, 30

*Banff, Ltd. v. Federated Dep't Stores*
841 F.2d 486, 490 (2d Cir. 1988)...............................................................................38

*Bankers Trust Co. v. Bernstein*
169 A.D.2d 400, 563 N.Y.S.2d 821 (N.Y. App. Div. 1st Dep't 1991).........................14

*Brennan's Inc. v. Brennan's Rest. LLC*
360 F.3d 125 (2d Cir. 2004).......................................................................................23

*Bulman v. 2BKCO, Inc.*
882 F. Supp. 2d 551 (S.D.N.Y. 2012)....................................................................... 16

*Cadbury Beverages v. Cott Corp.*
73 F.3d 474 (2d Cir. 1996)....................................................................................... 14

*Chloe v. Queen Bee of Beverly Hills, LLC*
No. 06 Civ. 3140 (RJH), 2011 U.S. Dist. LEXIS 94000 (S.D.N.Y. 2011)..................22

*De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.*
440 F. Supp. 2d 249 (S.D.N.Y. 2006)......................................................................25

*Fetler v. Houghton Mifflin Co.*
364 F.2d 650 (2d Cir. 1966).......................................................................................13

*Girl Scouts of United States v. Bantam Doubleday Dell Publishing Group, Inc.*
808 F. Supp. 1112 (S.D.N.Y.1992)........................................................................... 18

*GoSmile, Inc. v. Levine*
769 F. Supp. 2d 630 (S.D.N.Y. 2011)...................................................................... 20

*Jones v. City Sch. Dist.*
695 F. Supp. 2d 136 (S.D.N.Y. 2010) .......................................................................14

*Juicy Couture, Inc. v. Bella Int'l, Ltd.*

iv

930 F. Supp. 2d 489 (S.D.N.Y. 2013)……………………………………………………22, 23

*Kronos v. AVX Corp.*
81 N.Y.2d 90, 612 N.E.2d 289, 595 N.Y.S.2d 931 (1993).........................................................14

*Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*
192 F.3d 337 (2d Cir. 1999)…………………………………………………………….. 23

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*
799 F.2d 867 (2d Cir. 1986)…………………………………………………………….. 18

*Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*
378 F. Supp. 2d 448 (S.D.N.Y. 2005).................................................................16, 17

*Malletier v. Burlington Coat Factory Warehouse Corp.*
426 F.3d 532 (2d Cir. 2005)................................................................................27

*McGregor-Doniger, Inc. v. Drizzle, Inc.*
599 F.2d 1126 (2d Cir. 1979)……………………………………………………… 36

*Medici Classics Prods. LLC v. Medici Group LLC*
683 F. Supp. 2d 304 (S.D.N.Y. 2010)…………………………………………………31, 33

*Naantaanbuu v. Abernathy*
746 F. Supp. 378 (S.D.N.Y. 1990) ...................................................................13

*Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.*
887 F. Supp. 2d 519 (S.D.N.Y. 2012)…………………………………………...28, 31, 36

*Pfizer Inc. v. Astra Pharmaceutical Prods.*
858 F. Supp. 1305 (S.D.N.Y.1994)…………………………………………………….. 18

*Philip Morris USA Inc. v. C.H. Rhodes, Inc.*
Case No. 08 CV 0069, 2010 WL 119612, at *3 (E.D.N.Y. Mar. 26, 2010)...........................32, 33

*Philip Morris USA Inc. v. Felizardo*
No. 03 Civ. 5891, 2004 U.S. Dist. LEXIS 11154, at *18 (S.D.N.Y. June 18, 2004)...................17

*Polaroid Corp. v. Polarad Elecs. Corp.*
287 F.2d 495 (2d Cir. 1961)…………………………………………………………….. *passim*

*Redd v. N.Y. State Div. of Parole*
678 F.3d 166 (2d Cir. 2012)................................................................................11

*Star Indus. v. Bacardi & Co.*
412 F.3d 373 (2d Cir. 2005)................................................................23, 26, 36

*Time, Inc. v. Petersen Publ'g Co. LLC*
173 F.3d 113 (2d Cir. 1999)...................................................................22

*Unique Sports Generation, Inc. v. LGH-III, LLC*
2005 U.S. Dist. LEXIS 22133 (S.D.N.Y. Sept. 29, 2005)...........................14

*Willson v. Association of Graduates of the United States Military Acad.*
946 F. Supp. 294 (S.D.N.Y. 1996)...........................................................13

*World Wrestling Fed'n Entm't, Inc. v. Bozell*
142 F. Supp. 2d 514 (S.D.N.Y.2001).......................................................13

## Statutes and Rules

15 U.S.C. § 1114……………………………………………………………20

15 U.S.C. § 1127………………………………………………….......16, 18

Fed. R. Civ. P. 56(a)…………………………………………….....1, 11

Local Civil Rule 56.1....................................................................1, 4, 21

## Legislative History

130 Cong. Rec. H. 12078…………………………………………….........16, 19

## Treatises

1 Robert D. Sack, *Sack on Defamation* 8-11 (3d ed. 2000)........................13

2-5 Gilson on Trademarks § 5.19………………………………………..19

## TABLE OF EXHIBITS AND FIGURES

| | |
|---|---|
| **Exhibit A** | Pictures of Sambo Metal-manufactured jewelry along with Lin & J jewelry |
| **Exhibit B** | Expert Report of Charles M. Ellias, GG and Addendum to Report |
| **Exhibit C** | Expert Report of Rob Wallace |
| **Exhibit D** | Expert Report of Dr. Warren Keegan |
| **Exhibit E** | Report of Michael Rappeport |
| **Exhibit F** | Reply of Michael Rappeport |
| **Exhibit G** | Condensed Deposition Transcript of Hyunkyo "Kenny" In |
| **Exhibit H** | Plaintiffs' Second Amended Complaint |
| **Exhibit I** | Declaration of Youngran Kim in Opposition to Motion for Summary Judgment |
| **Exhibit J** | Condensed Deposition Transcript of Youngran Kim |
| **Exhibit K** | Belco 9/5/2003 invoice to Sharon Beauty Supply |
| **Exhibit L** | Pictures of Belco products A139 and AS576 |
| **Exhibit M** | Condensed Deposition Transcript of Tiffany Walden |
| **Exhibit N** | Condensed Deposition Transcript of Robert Isen |
| **Exhibit O** | MODCO0000391-MODCO0000404 |
| **Exhibit P** | Portions of T over T Logo USPTO Trademark Prosecution Histories |
| **Exhibit Q** | USPTO Office Action |
| **Exhibit R** | River Light V, L.P. Notice of Opposition and Motion to Suspend Proceedings |
| **Exhibit S** | TBURCH0017354 |
| **Exhibit T** | Condensed Deposition Transcript of Charles Ellias |
| **Exhibit U** | Declaration of Howard Z. Myerowitz, Esq. in Opposition to Motion for Summary Judgment |
| **Exhibit V** | Follow-up Cease and Desist Letters Threatening Criminal Prosecution. |
| **Exhibit W** | Letter from Military Mother's Attorney regarding Tory Burch's Heavy-Handedness after Being Threatened with Criminal Prosecution |
| **Exhibit Y** | Wona Trading Seizure Preliminary Injunction |
| **Exhibit Z** | March 2013 email from Wona Trading to Tiffany Walden |
| **Exhibit AA** | "Tory Burch Fights Jewelry Counterfeiters in Court" "Tory Burch Sues Bluebell Accessories" Articles |
| **Exhibit BB** | 2008/2009 Invoices of Isis Cross Products |
| **Exhibit CC** | "The Worship of the Church" Excerpt |
| **Exhibit DD** | Hornung's *Handbook of Design and Devices* |
| **Exhibit EE** | Condensed Deposition Transcript of Michael Rappeport |
| **Exhibit FF** | Condensed Deposition Transcript of Sara Rotman |
| **Exhibit GG** | Condensed Deposition Transcript of Russell Mangum, III |
| | |
| **Figure 1** | Designs at Issue: Tory Burch Designs and Cross Logo Series |
| **Figure 2** | Cross Imagery in Tory Burch Products |
| **Figure 3** | USPTO Designations |
| **Figure 4** | Isis Cross Lawsuit Appendix |
| **Figure 5** | Tory Burch's Targets: Women- and Minority-Owned Businesses |

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Defendants Lin & J International, Inc., Youngran Kim, LJ Brand, Inc., and NJ Lin & J International, Inc. (hereinafter collectively "Defendants" or "Lin & J"), by their attorneys, Song Law Firm, respectfully submit this memorandum of law in Opposition to Plaintiffs River Light V, L.P.'s and Tory Burch LLC's (hereinafter collectively "Tory Burch" or "Plaintiffs") Motion for Summary Judgment.

## PRELIMINARY STATEMENT

This is a **highly unusual** case of alleged trademark and copyright infringement. Lin & J sells a line of jewelry designed by Lin & J that features dozens of cross-based variations, some of which are called the Isis Cross. The Isis Cross Designs and its variations are equal-armed-cross-based designs, are based on the ancient Coptic cross, and feature other decorative elements, such as stylized fleurs-de-lis, in each quadrant of the design. Tory Burch utilizes logos which consist of variations of an inverted "T" over an upright "T," which, because of its configuration, has the appearance of an equal-armed cross with a horizontal split. Indeed, the newest of Tory Burch's three logos introduced a vertical split, which unmistakably creates a cross. In addition, Tory Burch is well aware that Defendant Youngran Kim, Lin & J's president and founder, sold products featuring the predecessor mark, a variation of the Isis Cross Design, in 2003, well before Tory Burch even used her original logo in commerce. Nevertheless, Tory Burch has brought this suit and crusaded against Lin & J.

This motion, like so much of what Tory Burch has done vis-à-vis Lin & J, is a vast overreach. Tory Burch comes before this Court with unclean hands, having filed at least nine separate lawsuits in five federal judicial districts in four states regarding the very same line of products, including at least four of those lawsuits after it was aware that Lin & J was the manufacturer of the products in question; having issued dozens of highly intimidating cease and

desist letters, some of which demanded six-figure settlements and/or threatened criminal prosecution should the customers in question not comply with Tory Burch's outrageous demands; having carried out at least one unlawful civil seizure upon a Lin & J customer who had already been sued by Tory Burch in this Courthouse; having defamed Lin & J as counterfeiters; having interfered with Lin & J's relationship with its customers with knowledge as to what it was doing; and having issued third-party subpoenas in violation of the Federal Rules; all in an effort to maximize the public effect of their efforts, to bully Defendants into exiting the cross-based jewelry market, and, most importantly, to send the vainglorious message that Tory Burch is a large corporation whose beliefs, accomplishments, and "inventions" must be respected.

Defendants have not copied Tory Burch's logos, as Tory Burch has brazenly accused them of doing, nor have they created jewelry that is commonly confused as Tory Burch jewelry. Rather, **Tory Burch is itself causing** any confusion that may have been witnessed, by adopting equal-armed-cross-based logos and incorporating traditional equal-armed-cross-based patterns into its products. At the same time, Defendants have had to endure Tory Burch's full-on assault, which has included defamation, tortious interference, and abuse of the litigation process. Accordingly, Plaintiffs' Motion for Summary Judgment should be denied in its entirety.

## COUNTER-STATEMENT OF FACTS

Tory Burch, as is its custom in submissions to this Court, has failed to give the Court some of the most important pieces of information and evidence. To remedy this, Defendants will attempt to fill in the gaps by explaining from where Lin & J's and Tory Burch's respective logos originate. These facts, as outlined below, as part of the record as a whole, create genuine issues of fact that preclude the entry of summary judgment in Plaintiffs' favor.

**A.     Prior Uses of the Isis Cross Design**

2

Approximately two years after emigrating from South Korea, in 2003, Defendant Youngran Kim (hereinafter "Ms. Kim") founded a company in the United States known as Belco. Kim Dep. Trans., 134:21-22. Though Ms. Kim was not involved in Belco's day-to-day operations, she created many of the designs used by Belco, including what has become known in this litigation as "the predecessor mark." Kim Dep. Trans., 174:22-175:3. In the context of this litigation, the predecessor mark is the following design (along with very slight variations, such as putting a circle around that design or reversing the design in the negative space):



.

At least as early as September 5, 2003, Belco sold at least two different products featuring the predecessor mark, under product numbers A139 and AS576. Kim Dep. Trans., 146:12-21; Exs. K and L. The predecessor mark was created by Ms. Kim when she looked for inspiration to designs created by her father, Ji Hyun Kim, the owner of a metalworking and jewelry subassembly company in South Korea known as Sambo Metal. Kim Decl., ¶ 6; Ex. A (featuring Sambo Metal pieces marked off next to Lin & J pieces). Also, in creating the predecessor mark, Ms. Kim was inspired by her Christian religious beliefs and the Coptic cross, an ancient Christian symbol. Kim Decl., ¶ 15.

**B.    Tory Burch's Logos and Crosses**

To assist her in launching and branding her company, Ms. Tory Burch enlisted the help of brand development company MODCo Creative Designs (hereinafter "MODCo"). Walden Dep.

3

Trans., 94:16-21. The samples and ideas Ms. Burch brought to MODCo included her father's crest. *Id.*, 94:23-24. MODCo responded to Tory Burch with a number of proposed logos and designs for prints. Those proposed logos included the T over T with Circle, to which Ms. Burch had an immediate, emotional reaction. Isen Dep. Trans., 31:18-20. In addition, the proposed prints featured patterns based on several traditional equal-armed crosses, such as the cross recercelé,[1] the cross potent,[2] the cross moline;[3] and a voided cross potent.[4] Figure 2, page 1; Exhibit O. With the help of MODCo, Tory Burch launched its brand in February of 2004. Walden Dep. Trans., 94:16-21; Pls.' Rule 56.1 Statement hereinafter "SUMF"), ¶ 3.

Tory Burch adopted the "T over T with Circle" logo that had been created with MODCo, pictured at SUMF paragraph 13, as its primary logo. SUMF, ¶¶ 13, 15. Several years later, Tory Burch developed a second logo, the "T over T without Circle" logo, which contained the same inverted "T"s but which did not have the ring around it.

Then, in 2009, Tory Burch worked with third party Luxottica Eyewear and devised a third logo, which consisted of the T over T without Circle plus an added vertical split, the "T over T with Split." Walden Dep. Trans., 95:14-19; SUMF, ¶ 19, RSUMF, ¶ 19. Tory Burch has trademark registrations for the T over T with Circle and the T over T without Circle in Class 14 - Jewelry, but it has no such registration for the T over T with Split. *See* SUMF, ¶ 66; Defendants' Response to Plaintiffs' Statement of Undisputed Material Facts (hereinafter "RSUMF"), ¶ 66.

Tory Burch's jewelry, excluding the branded logo Tory Burch places on the product, is neither unique nor original. Ex. B, Sections VI, XII, and XIII. Were one to remove the logo from a Tory Burch product, that product would not be readily identifiable with any brand. *Id.*, at

---

[1] MODCO0000397; *cf.* Ex. CC, p. 58.
[2] Figure 2, p. 1; cf. Ex. DD, p. 100, design number 894.
[3] MODCO0000404; *cf.* Ex. CC, p. 58.
[4] MODCO0000403; *cf.* Ex. DD, p. 101, design number 909.

Section X(a)(2). This is because Tory Burch typically adopts classic styles of jewelry and "remakes" that style by prominently featuring a Tory Burch logo on the piece. *Id.*

Though Tory Burch's logos are composed of stylized "T"s, those logos appear to consumers as cross-reminiscent, contain crosses, or are crosses. Fig. 3; Ex. C, § C(4); Ex. B, § V(a)(8); Ex. R, ¶ 10 (opposing Lin & J's application on the grounds that **both Tory Burch's and Lin & J's trademarks contain a cross** design with the outer edges of the cross curving inward).

**C.**     **Lin & J Develops the Isis Cross Design**

Youngran Kim founded Lin & J International, Inc. in 2005. Kim Decl., ¶ 9. While at Lin & J, Youngran Kim developed the Isis Cross Design. *Id.* The Isis Cross Design is as follows (along with a number of very close variations):



The creation of the Isis Cross Design and other variations was inspired by previous designs Ms. Kim had created, including the predecessor mark; the designs Ms. Kim's father had created in Korea; Ms. Kim's Christian religious feeling; and the Coptic cross, an ancient Christian symbol. Kim Decl., ¶ 15. Lin & J has identified 34 variations in the Isis Cross Logo Series, most of which are voided crosses. *See* Fig. 1. Lin & J's designs are indisputably **not** exact copies of Tory Burch's designs, given the differences between those designs. Fig. 1; Ex. B, §§ V and X(a)(1).

5

Lin & J has sold hundreds of different products featuring the predecessor mark and other cross-based designs, including the Isis Cross Design (hereinafter "Isis Cross products"). Kim Decl., ¶ 15. Though Tory Burch has questioned the reliability of Lin & J's older invoices, a third-party customer, pursuant to a Tory Burch subpoena, produced invoices evidencing 2008 and 2009 sales Isis Cross products. *See* Ex. BB. Lin & J has turned over to Tory Burch hundreds of pages of correspondence with its supplier of Isis Cross products abroad covering several years and detailing instructions for assembling Isis Cross products, none of which indicate even the slightest reference to Tory Burch. Lin & J labels Isis Cross products using "Isis Creative" tags and sells them under the Isis Creative brand. Kim Dep. Trans., 367:2-9, 371:12-372:1.

After Lin & J applied for a trademark for the Isis Cross Design in January of 2013, the United States Patent and Trademark Office (hereinafter "the USPTO"), in evaluating the Isis Cross Design, did not raise at any time an issue of likelihood of confusion with any already-registered design, including Tory Burch's T over T logos. Exhibit Q; Kim Decl., ¶ 13. Furthermore, the USPTO did not find that there was a likelihood of confusion with Tory Burch's logos assigned the Isis Cross Design to a separate category from the Tory Burch logos.[5] *See* Fig. 3. Following the opposition and motion to stay filed by Plaintiffs in February 2014, the Isis Cross Design trademark application was stayed pending the outcome of this litigation. *See* Ex. R.

**D.**     **Tory Burch and Lin & J Do Not Compete**

Tory Burch and Lin & J do not compete with each other for the same customers and dollars in the marketplace. Ex. D, ¶¶ 70-74. Lin & J occupies the entry end of the price spectrum

---

[5] The Isis Cross Design, according to the USPTO, "consists of a stylized fanciful cross design;" was assigned the Mark Drawing Code "DESIGN ONLY;" and was assigned the Design Search Code "24.13.25 - Cross, ankh; Cross, Maltese; Other crosses, including ankh, Maltese."
By contrast, Tory Burch's 3 T over T logos were assigned the Mark Drawing Codes "DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS" or "WORDS, LETTERS, AND/OR NUMBERS IN STYLIZED FORM" and were assigned the Design Search Codes 09.01.02, 26.01.21 and 27.03.01. Tory Burch's registrations recognize the T over T logos as having been created from stylized "T"s.

for non-precious jewelry while Tory Burch occupies the high end of this spectrum. *Id.*; SUMF ¶ 77; RSUMF ¶ 77; *see also* Ex. B, § IV(b) (defining "fine jewelry" as jewelry made from precious metals and "costume jewelry" as the broad swath of jewelry made from non-noble metals). Lin & J's jewelry is not an economic substitute for Tory Burch's. Ex. D, ¶¶ 70-74.

Tory Burch targets and sells to customers who have high discretionary incomes, who are more discerning in what jewelry they will wear, and who are specifically seeking *genuine* luxury branded fashion jewelry. Ex. B, § VIII(c). Tory Burch consumers are paying a premium (above the intrinsic value of the product) that is associated with the brand just to be able to say they are wearing Tory Burch products and are desiring only genuine Tory Burch products. *Id.*; Report of Dr. William Keegan, ¶¶ 44-46. Tory Burch consumers typically buy their products through Tory Burch's online store, Tory Burch retail outlets, or authorized resellers. SUMF, ¶ 75. Tory Burch retains significant control over its products even after they begin moving through the channels of distribution. Report of Dr. Warren Keegan, ¶¶ 55-57 (reporting that Tory Burch maintains strict control over its jewelry as it moves through the channels of distribution, the "essence of a luxury brand"); SUMF, ¶ 74-79 (emphasizing Tory Burch's "strict quality control standards over all of its products and its authorized sub-licensees' and retailers' use of [its] Trademarks").

Lin & J, by contrast, retains no control over the product after the initial sale. Ex. D, ¶¶ 54, 58. Nearly all Lin & J consumers purchase the product not through Lin & J but through a third party. Kim Dep. Trans., 715:20-716:13. Whereas Tory Burch's jewelry is a high-quality branded product for which the materials and workmanship are of a high standard, Isis Cross products are entry-level costume jewelry of limited quality and branding. Ex. D, ¶¶ 45-46. Thus, Tory Burch's and Lin & J's products are readily distinguishable to consumers by a number of factors,

including their disparate price points, the channels of trade through which they are distributed, and the branding and especially the quality of the products. *Id.*, ¶¶ 47, 52, 60.

E.    **Tory Burch's Campaign of Intimidation and Litigation against Lin & J**

Beginning in 2012 and continuing well into 2014, including during the pendency of this lawsuit, Tory Burch has sent over one hundred initial cease and desist (hereinafter "C&D") letters to customers of Lin & J or parties farther down the chain of distribution. These C&D letters did not name Lin & J as such, but all of them included pictures of Isis Cross products, repeatedly labeled these "Counterfeit Jewelry," and demanded cooperation in Tory Burch's "investigative" efforts. Many of them demanded six-figure settlements even though they were clearly targeted at individuals, lone online website users, or very small organizations.

When some of those recipients did not respond, Tory Burch took it upon itself to send follow-up letters to some of those recipients, including direct customers of Lin & J. Dozens of these follow-up letters included threats of criminal prosecution.[6] Ex. W. Tory Burch's approach to C&D letters was so heavy-handed that, after being threatened with criminal prosecution, one recipient's lawyer reproached Tory Burch for harassing with "scare tactics" a military wife and mother who was simply trying to support herself while her husband was absent. Ex. W.

Tory Burch filed a first lawsuit against Lin & J's customers regarding Isis Cross products on March 22, 2013, against Bluebell Accessories.[7] Fig. 4. Next, Tory Burch filed four more lawsuits on May 31, 2013: (1) the instant case against Lin & J; (2) a suit against Glitzlane

---

[6] These threats were delivered implicitly through the language: "As you are aware, counterfeiting is a civil and criminal offense, and although Tory Burch hopes to amicable resolve this matter with you, we require a response to our letters and for you to provide the information requested." Though Tory Burch will likely argue that this language is innocuous, it was undoubtedly clear to the recipient what Tory Burch was saying: "*Cooperate or you will be civilly or, even more intimidatingly, **criminally prosecuted***." Otherwise, why mention criminal offenses at all? Clearly, it is because Tory Burch was seeking to gain advantage in a civil trademark dispute. The individual who signed these follow-up letters was Tory Burch in-house attorney and designated corporate representative for this litigation Tiffany Walden, Senior Counsel - Global Brand Enforcement. An attorney's act of threatening criminal prosecution in this way is particularly troubling and raises serious ethical concerns.
[7] C.A. No. 1.13 –cv-01941-RA (Hon. Ronnie Abrams, U.S.D.J.).

Boutique;[8] (3) a lawsuit against Wona Trading, Inc;[9] and (4) one against Golden Stella, Inc. in

Georgia.[10] *Id.* Then, not content with the four lawsuits it had already brought, including one

against Lin & J, whom it unquestionably had already identified as the manufacturer, after letting

an additional seven months pass, Tory Burch brought suit against four more of Lin & J's

customers. *Id.* These were Jewelria, Inc.;[11] Sam Mi Trading;[12] C & L Trading;[13] and D & D

Imports.[14] *Id.* These last two waves of lawsuits were filed in five federal judicial districts in four

different states and were evidently coordinated to maximize public effect. *Id.*

      Even as it was waging this campaign of litigation and intimidation, Tory Burch was

having conversations with the press, publicizing its purportedly righteous "anti-counterfeiting"

efforts. Ex. AA. Specifically, in an article published the very same day as the lawsuit against Lin

& J and three of its customers was filed (so it almost certainly was arranged ahead of time),

Robert Isen, President of Corporate Development and Chief Legal Officer of Tory Burch, is

quoted as having spoken to Women's Wear Daily (hereinafter "WWD") regarding the four May

31 lawsuits and the Bluebell lawsuit (hereinafter "May 31 article"). *Id.*

      Significantly, Tory Burch told WWD "that it believes the lawsuits are 'interconnected.'"

*Id.* Isen then went on to assert that Tory Burch "will continue to take counterfeiting and

copyright infringement seriously." *Id.* The article states that Lin & J International, Inc. and Ms.

Kim were sued and identifies Lin & J as a "Chinese company" that has "sold 'thousands' of units

of counterfeit Burch jewelry to a host of retailers." The article continues that Tory Burch "also

---

[8] C.A. No. 1.13 –cv-03668-PGG (Hon. Paul G. Gardephe, U.S.D.J.).
[9] C.A. No. 1:13-cv-03667-RA (Hon. Ronnie Abrams, U.S.D.J.).
[10] C.A. No. 1:13-cv-01839-TCB (U.S.D.C. – Northern  District of Georgia).
[11] C.A. No. 4:13-cv-03740; (U.S.D.C. – Southern District of Texas).
[12] C.A. No. 3:13-cv-04995-M; (U.S.D.C. – Northern District of Texas).
[13] C.A. No. 1:13-cv-24605-CMA; (U.S.D.C. – Southern District of Florida).
[14] C.A. No. 1:13-cv-24606-UU; (U.S.D.C. – Southern District of Florida).

identified a wholesaler in Alabama who fingered Lin & J as their supplier of thousands of units of fake jewelry." Isen went on to all four of the May 31 lawsuits' defendants "large actors."

While the article goes on to discuss the other suits' defendants, it further states that "Counsel for Burch said they believe Glitzlane obtained the knockoffs from one of the other wholesalers it filed against." *Id.* Thus, without considering other evidence, Tory Burch was well aware that Lin & J was the supplier of the jewelry at issue when it repeatedly made statements alleging that Lin & J was a counterfeiter, a trademark infringer, a supplier of thousands of units of fake jewelry, and a large actor (meaning a large-scale counterfeiter and infringer).

After the instant lawsuit and a suit against Wona Trading, Inc.[15] were filed in this very Courthouse, Tory Burch, upon an Ex Parte Order to Show Cause to the Hon. Thomas Griesa, U.S.D.J., in "the John Doe case," 11-cv-8236, procured a Temporary Restraining Order and Seizure Order to seize goods from Lin & J customer Wona Trading, Inc. *See* Ex. Y. Tory Burch did so with **full knowledge** that Wona Trading, Inc. was a customer of Lin & J's.[16] *See* March 2013 email from Wona Trading to Tiffany Walden. As one can see from the Order to Show Cause, the only Plaintiffs in the case are the instant Plaintiffs. Ex. Y. Similarly, the Order to Show Cause lists applicable Tory Burch intellectual property, including some of the intellectual property that Tory Burch has claimed in this lawsuit Lin & J infringes. *Id.*

Tory Burch has proceeded by prosecuting this case vigorously. Using customer information it had, in part, gleaned from documents disclosed to it by Lin & J subject to the Protective Order, Tory Burch issued third-party subpoenas *duces tecum* in violation of the notice requirement of Fed. R. Civ. P. 45(a)(4). Myerowitz Decl., ¶¶ 27-35. Despite the agreement the parties thereafter came to, Tory Burch sent correspondence attempting to enforce subpoenas it

---

[15] The suit filed by the instant Plaintiffs against Wona Trading, Inc. was under 1:13-cv-03667, before Hon. Ronnie Abrams, U.S.D.J.
[16] Wona Trading, Inc. no longer buys from Lin & J due to Tory Burch's actions.

had withdrawn and agreed not to re-serve. *Id.* As such, Tory Burch violated the spirit, if not the

letter, of the Court-Ordered Protective Order. *Id.* Lin & J received customer complaints as a

result, a further injury to Lin & J's business and business prospects inflicted by Tory Burch. *Id.*

## LEGAL STANDARD

A grant of summary judgment is appropriate only "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). Thus, the "burden of demonstrating that no material fact exists lies with the

moving party." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011).

In evaluating a summary judgment motion, "the evidence of the non-movant is to be believed; all

permissible inferences are to be drawn in [the non-movant's] favor; and the court must disregard

all evidence favorable to the moving party that the jury is not required to believe." *Redd v. N.Y.*

*State Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (internal quotation marks omitted). As a

result, "[s]ummary judgment is inappropriate when the admissible materials in the record 'make

it arguable' that the claim has merit," or "[w]here an issue as to a material fact cannot be

resolved without observation of the demeanor of witnesses in order to evaluate their credibility."

*Id.* "In sum, summary judgment is proper only when, with all permissible inferences and

credibility questions resolved in favor of the party against whom judgment is sought, there can

be but one reasonable conclusion as to the verdict, i.e., it is quite clear what the truth is." *Id*. Tory

Burch has not met this high burden.

## ARGUMENT

### A.    Questions of Fact Regarding Counterclaims Preclude Entry of Summary Judgment

Plaintiffs begin their argument by twisting Youngran Kim's words from deposition,

where she stated that she only sued Tory Burch because she felt it was "unfair" that Tory Burch

sued her. Tory Burch twisted that into some sort of acknowledgement that the counterclaims lack

merit. In reality, Ms. Kim was saying that unlike Tory Burch, she is not very litigious, has never

been accused of this kind of alleged violation before, and would not normally sue somebody else.

However, Tory Burch has forced her to sue, by seeking to destroy her business and coming close

to accomplishing its goal. Tory Burch seeks summary judgment here on the counterclaims, but

what Tory Burch has done is neither lawful nor within its prerogatives to enforce its alleged

rights. Counterclaimants' suit has merit, and a jury should get to decide whether Tory Burch or

Lin & J has the right of these counterclaims as to Tory Burch's outrageous, obnoxious, and

offensive conduct.

### 1.    Entry of Summary Judgment on Defamation Is Inappropriate

With regard to the defamation counterclaim, Tory Burch raises the issue of whether the

defamatory statements were made "of and concerning" Defendants. There can be no doubt but

that they were. Plaintiffs rely on the fact that the C&D letters did not name Lin & J, and they

therefore argue that Tory Burch was not actually making any statements about Lin & J. However,

the facts and the law show otherwise. "[T]he question is whether the libel designates the plaintiff

in such a way as to let those who knew him understand that he was the person meant. It is not

necessary that all the world should understand the libel; it is sufficient if those who knew the

plaintiff can make out that he is the person meant." *Naantaanbuu v. Abernathy*, 746 F. Supp. 378,

380 (S.D.N.Y. 1990) (quoting *Fetler v. Houghton Mifflin Co.*, 364 F.2d 650, 654 (2d Cir. 1966).

In addition, Plaintiffs argue that Tory Burch's actions are covered by litigation privilege.

The litigation privilege "does not extend, however, to any communication made during the

course of a litigation. *World Wrestling Fed'n Entm't, Inc. v. Bozell*, 142 F. Supp. 2d 514, 534

(S.D.N.Y.2001) (quoting *Aequitron Med. v. Dyro*, 999 F. Supp. 294, 298 (E.D.N.Y.1998)).

"Communications directed to persons wholly unconnected to the lawsuit in question do not fall within the purview of the privilege." *Id.* This can include statements made to the press. *See Willson v. Association of Graduates of the United States Military Acad.*, 946 F. Supp. 294, 297 (S.D.N.Y. 1996) (denying application of the privilege because the statements were "allegedly made in a press conference"); 1 Robert D. Sack, *Sack on Defamation* 8-11 (3d ed. 2000) ("Statements to the press by a lawyer are not ordinarily privileged.").

It is undisputed that over the course of nearly two years, Tory Burch has done its best to spread the message that Isis Cross products are Tory Burch counterfeits. Tory Burch has dispatched over one hundred initial C&D letters, plus several dozen follow-up letters, to Lin & J's customers and customer's customers. This did a great deal to defame Defendants and brand them as counterfeiters. And as if that were not enough, Tory Burch elected to go to the media with its flawed views, compounding the defamation. It is further undisputed that the Isis Cross lawsuits were very well-covered, especially in online newspapers and blog, in large part because Tory Burch decided to go outside the litigation process and advertise its aggression in the media. Thus, Tory Burch's statements, both in initial and follow-up correspondence to customers and in solicited[17] media coverage of its "anti-counterfeiting" efforts, has yielded defamatory statements of and concerning Lin & J that carry it outside the litigation privilege. *See* Counter-Statement of Facts, *supra* (describing the defamatory statements).

**2.    Entry of Summary Judgment on Tortious Interference Is Inappropriate**

Under New York law, "a claim for tortious interference with contract requires proof of four elements: (1) a valid contract between plaintiff and a third party, (2) defendant's knowledge

---

[17] This is in sharp relief to the "unsolicited" media coverage Tory Burch proudly claims for its traditional T over T logos.

of the contract, (3) defendant's 'intentional inducement' of the third party to breach the contract, and (4) damages." *Jones v. City Sch. Dist.*, 695 F. Supp. 2d 136, 148 (S.D.N.Y. 2010).

"Further, to sustain a claim for tortious interference with a prospective contract with a third party, a plaintiff must demonstrate that (1) but for the actions of the defendant, the contract would have been formed and (2) in preventing the contract from being executed, the defendant intended to 'damage the plaintiff' or engaged in 'dishonest, unfair or otherwise improper' conduct." *Id.* (quoting *Bankers Trust Co. v. Bernstein*, 169 A.D.2d 400, 401, 563 N.Y.S.2d 821 (N.Y. App. Div. 1st Dep't 1991)). "With respect to the first element, a formal, binding contract is not required; rather, interferences with the opportunity of selling or buying chattels or services, and any other relations leading to potentially profitable contracts will suffice." *Unique Sports Generation, Inc. v. LGH-III, LLC*, 2005 U.S. Dist. LEXIS 22133 (S.D.N.Y. Sept. 29, 2005).

Lin & J had contractual relationships with numerous customers throughout the United States, over four hundred by Tory Burch's count. Plaintiffs' admit that they have known of Lin & J's existence since at least November 2012. SUMF, ¶ 123. Indeed, sometime during 2013, Plaintiffs' acknowledge that they were aware that Lin & J was the manufacturer; there is a genuine dispute because Plaintiffs claim it was during the summer whereas Defendants believe it was during the first quarter of the year. SUMF, ¶ 142; RSUMF, ¶ 142; *but see* the May 31 article (stating Tory Burch's belief that they had identified the supplier). In that environment, where Defendants are selling to many customers all over the United States, it is impossible that Tory Burch could not know the effects its actions would have on the manufacturer of Isis Cross products. Indeed, Ms. Kim gave an example of the effects of Tory Burch's crusade against Lin & J, which goes well beyond the mere sending of C&D letters and the filing of lawsuits, in her Certification in support of Defendants' request for a temporary restraining order. Dkt. No. 31, ¶

14

16. Tory Burch has targeted Lin & J's large customers, many of whom have returned the products they had purchased and stopped any and all transactions with Lin & J. *Id.*, at ¶ 17.

Similarly, Defendants have, at a minimum, raised a genuine issue of material fact as to whether Tory Burch acted with dishonest, unfair, or otherwise improper conduct in its interference with Lin & J's contractual relationships. Plaintiffs' conduct was independently tortious in that it constitutes both defamation and abuse of process. *See supra* and *infra*. This is especially true as to the Wona Trading seizure, which was organized by Tory Burch. Indeed, the Order to Show Cause seeking a Temporary Restraining Order and Seizure Order is docketed within a docket Tory Burch, the only plaintiff in the John Doe case, keeps open specifically to maintain a revolving door of litigation. The Order to Show Cause specifically lists Tory Burch's marks, including some of the same that have been pleaded in this case. Ex. Y. Thus, the idea that Tory Burch is now attempting to evade the consequences of its actions in conducting *ex parte* seizures by blaming them on an unknowing attorney, who is responsible for knowing regardless, is unconscionable when the impact on Lin & J's business has been so serious and negative. Accordingly, there is a dispute of material fact as to tortious interference.

### 3.    Entry of Summary Judgment on Abuse of Process Is Inappropriate

Abuse of process entails (1) regularly issued [civil] process, (2) an intent to do harm without excuse or justification, (3) use of the process in a perverted manner to obtain a collateral objective, and (4) actual or special damages. *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 2014 U.S. Dist. LEXIS 44039 (S.D.N.Y. 2014). "[T]o satisfy the third element, a plaintiff must allege only that a defendant aimed to achieve a collateral purpose beyond or *in addition to* the use of process." *Id.* (internal quotation marks omitted). Further, the pursuit of the collateral objective must occur after the process is issued. *Id.*

As indicated above, Tory Burch has used the regularly issued civil process of C&D letters and lawsuits to ensnare Lin & J. However, immediately after bringing the lawsuit, Tory Burch was speaking to the media, thereby lending credence to the assertion that Tory Burch is using this regularly issued process for an irregular, collateral purpose. These collateral purposes include burnishing its own credentials as an industry leader and driving Lin & J, a company they somehow view as a threat due to the commonality that they have cross-based logos, out of business. Tory Burch furthered the pursuit of this collateral purpose by executing the Wona Trading seizure, which reverberated throughout the community and had a substantial, negative effect on Lin & J, and which was not the end of Tory Burch's misconduct. Accordingly, a genuine issue of fact has been raised as to the Counterclaims, which should be allowed to proceed to trial.

To address Tory Burch's claim that Lin & J's counterclaims should be barred due to its alleged unclean hands, Lin & J respectfully refers the Court to its Opposition to the Motion for Sanctions. Lin & J has proceeded at all times earnestly and in good faith, even as Tory Burch has put it under siege and left its survival as a business in question. Thus, there are genuine issues of fact regarding the counterclaims to be resolved at trial.

**B.    Questions of Fact Regarding Counterfeiting Preclude Entry of Summary Judgment**

A "counterfeit" is "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. In this context, "spurious" means "not genuine or authentic." 130 Cong. Rec. H. 12078 (joint statement on 1984 trademark counterfeiting legislation), reprinted in Vol. 8, p. 34-618. A plaintiff must show that it has a valid mark entitled to protection under the Lanham Act and that defendants used an identical or substantially indistinguishable mark in commerce in a way that would likely cause confusion

16

among the relevant consuming public as the source of the goods. *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 455 (S.D.N.Y.2005). "[W]here counterfeit marks are involved, it is not 'necessary to perform the step-by-step examination of each Polaroid factor because counterfeit marks are inherently confusing.'" *Id.* (citing *Philip Morris USA Inc. v. Felizardo*, No. 03 Civ. 5891, 2004 U.S. Dist. LEXIS 11154, at *18 (S.D.N.Y. June 18, 2004).

1.   **At a Minimum, There Is a Question of Fact as to Whether Defendants Have Counterfeited the "Tory Burch" Word Mark**

Plaintiffs begin their short section seeking summary judgment as to claims of trademark counterfeiting by presenting very briefly the argument that Lin & J has counterfeited the "Tory Burch" word mark by including the description "Tory Burch Style Stretch Ring" for <u>item number RT31 only</u> on seventeen invoices, all from within two months, out of several thousand invoices produced in this case. Defendants respectfully submit that this constitutes a *de minimis* amount, well under one percent, thereby demonstrating that the inclusion of this inaccurate description was done purely by mistake and without intention to capitalize on any goodwill Tory Burch may have accumulated in its word mark. However, in the event that the Court does reach this argument, Defendants respectfully submit that this Court should take note that Plaintiffs, strangely, support their argument by citing only to a single legal authority, a 2010 opinion of the United States District Court for the District of Minnesota that is certainly not binding on this Court. *See 3M Co. v. Mohan*, Case No. 09-1413, 2010 WL 5095676 (D. Minn. Nov. 24, 2010).

Indeed, the *3M* case, which apparently involved the use of the word marks, without qualification or alteration, is not even on point with the instant case. Here, Defendants did not include on the invoices the simple term "Tory Burch," which is Plaintiffs' trademark. Instead, the description read "Tory Burch **Style**," (emphasis added) along with a follow-on description of

17

the product, "Stretch Ring." Thus, with this description, Defendants were actually notifying the purchasing companies that these were not Tory Burch goods. See RSUMF, ¶¶ 97, 167.

Similarly, in *3M*, the uses of the word marks were being done on a website that was directed towards consumers. See *Id.* This is a strong contrast to the instant allegations, where Tory Burch has not claimed that Lin & J ever sold any products as "Tory Burch." Rather, the most serious allegation that Tory Burch can attempt to support is that the words "Tory Burch" appeared as part of a larger description on fewer than twenty invoices that were not visible to the public at all, or even to the purchaser at the time of the purchase.[18] Indeed, Youngran Kim has explained that Lin & J does not even consider the description that is included on an invoice after a sale to be that important; for Lin & J's purposes in selling and creating an invoice, the item number and color code are the important identifiers. *See* RSUMF, ¶¶ 167-169.

Thus, there is no evidence that Defendants used a mark identical to or substantially indistinguishable from the "Tory Burch" word mark in a way that was inherently confusing as to the source of the products.  At a minimum, a genuine issue of fact has been raised.

**2.      At a Minimum, There Is a Question of Fact as to Whether Defendants Have Counterfeited Products Bearing the T over T Logos**

As explained above, a "counterfeit" is "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. "A typical infringement case…does not reach the level of counterfeiting," which involves the use of an "inherently confusing" mark. 2-5 Gilson on Trademarks § 5.19; *Lorillard Tobacco*, 378 F. Supp. 2d at 459.

---

[18] Lin & J's invoices are typically included with the shipment of the goods to the customer and are not typically viewed in advance by the customer or relied upon in negotiating and conducting a sale.

Indeed, the sponsors of the 1984 Trademark Counterfeiting Act made clear that they did "not intend to treat as counterfeiting what would formerly have been arguable, but not clear-cut, cases of trademark infringement." 130 Cong. Rec. H. 12078 (daily ed. Oct. 10, 1983) (joint statement on 1984 trademark counterfeiting legislation), reprinted at Vol. 8, p. 34-619; *see also* 2-5 Gilson on Trademarks § 5.19 ("All counterfeits infringe, but not all infringements are counterfeit…In a typical counterfeiting case, however, the producer of the fake merchandise intends its 'trademark' to be impossible or very difficult to tell apart from the genuine article"). "If…consumer confusion is not *evident* and the court would need to balance the likelihood of confusion factors to determine whether the copied trademark is likely to confuse consumers, the mark is likely not a counterfeit." *Id.* (emphasis added).

Plaintiffs' counterfeiting claim in the instant case is but one of the most glaring examples of overreaching in bringing this suit. Tory Burch is well aware, and yet disingenuously fails to inform this Court, that the predecessor mark was in use in commerce by a company owned by Youngran Kim at least as early as September 5, 2003. Tory Burch is also well aware that President Kim was exposed to similar designs for decades in that her father was a metalworker whose company manufactured similar subassemblies and jewelry pieces, which inspired her to create the predecessor mark and the Isis Cross Design.

Even leaving aside the fact that the predecessor mark, one variation of the Isis Cross Design, was created and actually used in commerce well before February of 2004, when Tory Burch's Oldest T over T logo was used in commerce, Plaintiffs would have this Court find that a mark that the USPTO's analysis indicated was not likely to cause confusion with other registered marks is actually a copy of several other registered marks. The Isis Cross Design and its

variations are based on crosses, including the Coptic cross, with other features that indicate a religious association and/or hold religious meaning; Tory Burch's marks are based on "T"s.

Plaintiffs focus in this section of their argument on the idea that determinations of whether a product is counterfeit are made in reference to the mark's or marks' "appear[ance] on actual merchandise to an average purchaser." Pls. Mot. for Summ. Judg., 18. However, Plaintiffs take this argument too far, and the fact that the marks are easily distinguishable in many ways is highly relevant, especially insofar as Plaintiffs bear a high burden on this motion.

The study conducted by Defendants survey expert (hereinafter "the Wallace study") found between 85% and 95% of respondents agreeing either completely or somewhat that the Tory Burch designs and Lin & J designs are different from each other. Similarly, the lone jewelry expert in this case, Mr. Charles Ellias, has found that the marks are obviously different in several notable ways. Ex. B, Section V. That same expert stated that he "would never mistake a Lin & J Isis Cross product for a [Tory Burch] product" and that he "observe[d] no intention to deceive evident in Lin & J's jewelry," the usual purpose of counterfeiting. Ex. B, § X; 15 U.S.C. § 1114(1)(a); *see also Gucci America, Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003) (noting that "confusing the customer is the whole purpose of creating counterfeit goods").

The jewelry expert has also provided context that is critical for this Court to consider in assessing Tory Burch's claims, which, if taken at face value, like the chart running from page 19 to page 20 of Plaintiffs' brief, are plainly misleading. Mr. Ellias has explained that Tory Burch's products and Lin & J's products may appear similar upon a very cursory look because Tory Burch, like many fashion jewelry designers, adopts common styles of jewelry that have been used for decades and makes those "its own" by prominently featuring its logo on it. *See* Ex. B,

§§ VI, XII, and XIII (examining a spot sampling of approximately twenty pieces of Tory Burch jewelry[19] plus the pieces pleaded in the live Complaint, finding no original or unique pieces there, and concluding that the corresponding Lin & J pieces are not counterfeits); *see also Id.*, § VII, pp. 9-12 (discussing custom within the jewelry industry, explaining that counterfeiting requires the use of marks that are adopted with the intent to deceive, and demonstrating what real counterfeiters and counterfeit websites do). Crucially, **were one to remove the branded logo from a Tory Burch product, that product would not be readily identifiable with any brand**. *See* RSUMF, ¶ 43.

Thus, because there is nothing unique or original about Tory Burch's jewelry outside of the marks, Defendants have focused on evaluating the logos at issue (although not to the exclusion of the overall pieces, as has just been demonstrated). Likewise, examining the logos as they are placed on the products in question is not as important as in a typical case of counterfeiting (which this most decidedly is not), given that **Plaintiffs have testified that there is no commercial use or application of any of the various Isis Cross variations enumerated at paragraph 158 of the Response to Plaintiffs' Rule 56.1 Statement that would not be infringing.** *See* RSUMF, ¶ 158. The logos are indisputably not identical. Plaintiffs' assertions that government agencies have found in their favor are inaccurate. *See* RSUMF, ¶ 139. At a minimum, there is a genuine issue of fact as to whether the logos are substantially indistinguishable in their use on the products so as to render those goods likely to cause confusion as to source.

In addition, it is significant that Plaintiffs did not move this Court, nor did they move any of the other four district courts in which they have brought related actions, for a preliminary

---

[19] These spot-sampled pieces include jewelry from the four categories of jewelry Tory Burch has alleged infringement in: (1) bracelets, (2) necklaces, (3) earrings, and (4) rings.

injunction to stop Defendants from selling. If Plaintiffs truly believed Defendants had copied their marks, Defendants submit Tory Burch would have done so. The entire allegation of counterfeiting, Defendants submit, was concocted in order to maximize the public damage done to Defendants by linking them with alleged counterfeiting and to make the allegations of infringement appear more credible. At a minimum, a genuine issue of material fact exists as to whether Defendants have employed the use of a mark or marks that is or are identical or substantially indistinguishable from Tory Burch's in such a way as to create confusion over the source of the products.

## C.   Questions of Fact Regarding Trademark Infringement Preclude Entry of Summary Judgment

To prevail on a trademark infringement action under the Lanham Act, a plaintiff must demonstrate: (1) "that it has a valid mark entitled to protection," and (2) "that the defendant's use of that mark is likely to cause confusion." *Juicy Couture*, 930 F. Supp. 2d at 498-499 (quoting *Time, Inc. v. Petersen Publ'g Co. LLC*, 173 F.3d 113, 117 (2d Cir. 1999); *Chloe v. Queen Bee of Beverly Hills, LLC*, No. 06 Civ. 3140 (RJH), 2011 U.S. Dist. LEXIS 94000 (S.D.N.Y. 2011).

### 1.   <u>Likelihood of Confusion Standard</u>

In evaluating the prospects for consumer confusion between two sets of trademarked products based on the defendant's use of the allegedly infringing mark, Courts look to the following factors (dubbed the *Polaroid* factors):

> (1) the strength of the plaintiff's mark; (2) the similarity of the marks; (3) the competitive proximity of the products in the marketplace; (4) the likelihood that the senior user will "bridge the gap" by moving into the junior user's product market; (5) evidence of actual confusion; (6) the junior user's bad faith in adopting the mark; (7) the respective quality of the products; and (8) the sophistication of the consumers in the relevant market. <u>Polaroid Corp. v. Polarad Elecs. Corp.</u>, 287 F.2d 495 (2d Cir. 1961).

22

"[E]ach factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product." *Juicy Couture*, 930 F. Supp. 2d at 499 (quoting *Brennan's Inc. v. Brennan's Rest.*, LLC, 360 F.3d 125, 130 (2d Cir. 2004)). Application of the *Polaroid* factors to the facts of this matter leads to the clear conclusion that there are genuine issues of material fact outstanding in this inquiry such that the matter must be permitted to proceed to the finder of fact.

### 2.    <u>Validity and Strength of the Plaintiff's Marks</u>

The inquiry into the first *Polaroid* factor is typically combined with the question of whether the plaintiff's mark is valid and entitled to protection because "the strength or distinctiveness of a mark determines both the ease with which it may be established as a valid trademark and the degree of protection it will be accorded." *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 391 (2d Cir. 1995). "The strength of a mark is determined by its tendency to uniquely identify the source of the product. This tendency is strong to the extent that the mark is distinctive, either inherently or by virtue of having acquired secondary meaning." *Star Indus. v. Bacardi & Co.*, 412 F.3d 373, 384 (2d Cir. 2005). Distinctiveness, thus, is the touchstone of analysis under the first *Polaroid* factor.

"Registered marks are presumptively distinctive, although this can be overcome by showing that a registered mark is generic or is descriptive without secondary meaning." *Juicy Couture*, 930 F. Supp. 2d at 499 (S.D.N.Y. 2013). "[W]hen a plaintiff sues for infringement of its registered mark, the defendant bears the burden to rebut the presumption of [the] mark's protectibility by a preponderance of the evidence." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999).

In the instant matter, the distinctiveness of Tory Burch's T over T mark is called into serious question by the degree to which it has been changing and the degree to which it has been morphing into a true equal-armed cross, a historic symbol far less distinctive than Tory Burch's previous T over T design. With this evolution in the mark, Tory Burch has, in fact, been diluting the distinctiveness of its own trademark.

Plaintiffs may assert that the concurrent use of an uncircled T over T and a T over T contained within a circle does not dilute the strength of its T over T design, even insofar as they are crosses, an assertion that Defendants would argue defies logic and common sense. However, what is clear is that the latest version of the Tory Burch trademark design, T over T with Split, is nearly unrecognizable as a T over T.  *See* Donnelly Dep. Trans., 46:8-13 (Luxottica Eyewear representative, now a Luxottica vice president, who was on the design team with Tory Burch that Tory Burch claims first conceived of the T over T with Split logo, examining the logo and stating, "these don't actually look like Ts now to me, they look like they're separate squares").



**T over T with Split, New Tory Burch Design**

Rather, the insertion of the vertical split into the more traditional T over T designs has undeniably created a cross within a logo which was already cross-reminiscent if not outright perceived as a cross. Though a portion of the public may identify the T over T with Split with Tory Burch, the Wallace study conducted in this case found that a significant portion of the public identifies the T over T with Split with religious themes or a cross. *See* Section C(4)(f) of

the Report of Rob Wallace, annexed hereto as **Exhibit C**. Specifically, 17% of respondents, when viewing the T over T with Split logo, identified it as associated with a cross or religious theme. *Id.* That is as compared with only 9% who identified the T over T with Split with Tory Burch. Likewise, interestingly, this result was not strictly limited to the newest T over T logo, with 11% and 13% of respondents who viewed the T over T with Circle and the T over T without Circle, respectively, identifying those designs with a cross or religious theme.

Furthermore, it should come as no surprise that a large segment of the population sees a cross when looking at Tory Burch's logos, especially when one considers that Tory Burch has been using several other cross-based designs since the beginning of the company's history. Branding company MODCo took the information it was given by Ms. Tory Burch, including her father's crest, and provided Tory Burch with a number of cross-based ideas, both for logos and for official company patterns/prints to be used on products. *See* Figure 2; Exhibit O. The cross potent, voided cross potent, and cross recercelé were presented as options to Tory Burch for use on prints, with the cross potent and the voided cross potent ultimately used on Tory Burch's "Heritage Prints."[20] *See* Figure 2; Exhibit O.

Thus, as the result of Tory Burch's ongoing tinkering with its own mark and its continuous use of other versions of a cross, Tory Burch's logos appear to be at most moderately distinctive, and the first *Polaroid* factor tips, at best, only moderately in favor of Plaintiffs. The Court would be justified, however, in finding that the first *Polaroid* factor tips slightly in Defendants' favor, given that Tory Burch has taken steps at diluting its own mark and has actively promoted its brand using other visually similar but indisputably cross-based images.

### 3.   The Alleged Similarity of the Marks

---

[20] These heritage prints are "core to the brand" and have been "used since the beginning." Walden Dep. Trans., 104:3-12.

"When the secondary user's mark is not identical but merely similar to the plaintiff's mark, it is important to assess the degree of similarity between them." *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.*, 440 F. Supp. 2d 249, 275 (S.D.N.Y. 2006).  In making this determination, "courts look to the overall impression created by the logos and the context in which they are found and consider the totality of the factors that could cause confusion among prospective purchasers." *Star Indus.*, 412 F.3d at 386 (citation omitted).  Below are the designs in question.



**Lin & J's Isis Cross Design and predecessor mark**



**Tory Burch's T over T Designs**

Side-by-side observation yields numerous distinguishing characteristics which would jump out to a consumer, not the least of which is the undeniable fact that Tory Burch's design is

an inverted T over an upright T while Lin & J's design is an equal-armed cross. In addition, Tory Burch two older designs are not equilateral and do not contain vertical splits, whereas Lin & J's Isis Cross Design and predecessor mark are and do. Tory Burch's designs appear to incorporate partial or full circles into the quadrants, whereas Lin & J's designs' quadrants feature stylized fleurs-de-lis. Tory Burch's designs feature arrows in the "Beak"[21] of the T, whereas Lin & J's designs are rounded out differently.

Tory Burch, again, attempts to obfuscate by focusing solely on the overall commercial impression generated by the two companies' respective products and ignoring the blatant and glaring differences in the logos. There simply is no way to get around the fact that these logos are different (*see* above numerous distinguishing characteristics), were intended to represent different things or ideas ("T"s vs. crosses), and are used on jewelry that is not of like quality or branding. Consumers thus would readily eliminate Tory Burch as the source of Isis Cross products were they given the product to hold in their hands, which Tory Burch's survey did not allow them to do.[22] Tory Burch may respond that its survey was conducted the same way many other consumer surveys are done in trademark cases, but especially where Tory Burch is arguing post-sale confusion - probably the kind of alleged confusion that presents the lightest burden for Tory Burch in proving its substantial allegations[23] - it should be required to display stimuli to consumers in a way that they would see them in a post-sale context. Because they did not do so, among several other reasons, the Rappeport study is unreliable and inadmissible and Tory

---

[21] See Ex. B, Section V(a)(5). The "beak" is the portion of the T that extends outward from the "arm."
[22] Just one of many reasons that Tory Burch's survey was fatally and inadmissibly flawed, the stimuli used were not the products themselves, which is what consumers would see even in a post-sale context, but were printouts or photocopies of printouts of some of the pieces of jewelry.
[23] This is because it does not have to prove certain conditions in the market, as it would with pre-sale or point-of-sale confusion, and instead can rely on the general idea that consumers at some point downstream would see the jewelry being worn and be confused. See *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 n. 2 (2d Cir. 2005) ("The Lanham Act protects against several types of consumer confusion, including point-of-sale confusion, initial interest confusion, and post-sale confusion, and the Polaroid factors must be applied with an eye toward each of these" (emphasis in original)(internal citations omitted)).

27

Burch's myopic focus on the overall impression generated by the product to the exclusion of the designs' characteristics as they actually appear to consumers is misguided.

Moreover, it is highly significant that the United States Patent and Trademark Office, upon Defendants' application for trademark protection for the Isis Cross designs, did not even consider Defendants' and Plaintiffs' respective marks to be in the same category and **made a determination that Lin & J's Isis Cross design does not conflict with any other existing trademark**. Any reasonable examination of an Isis Cross product a consumer was about to buy, or even by a Tory Burch consumer in a post-sale context, would clearly indicate that it was not a Tory Burch product. These two sets of marks are similar only in a very superficial sense, as demonstrated by the 0%-8% confusion registered in the Wallace study. *See* Ex. C, Section C(4)(d). The second *Polaroid* factor heavily favors Defendants.

### 4.    The Lack of Competitive Proximity of the Products in the Marketplace

"This factor examines the extent to which the products compete with one another." *Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.*, 887 F. Supp. 2d 519, 536 (S.D.N.Y. 2012). "Courts examine 'the nature of the products themselves and the structure of the relevant market,' including 'the class of customers to whom the goods are sold, the manner in which the products are advertised, and the channels through which the goods are sold.' *Id.* (quoting *Cadbury Beverages v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996)).

As explained *supra* and *infra*, Lin & J sells jewelry bearing its mark primarily to distributors, wholesalers and retailers, with only a small portion of its sales coming from direct-to-consumer website sales. Tory Burch, on the other hand, maintains a massive operation wherein it operates dozens of retail outlets itself, in addition to its direct-to-consumer website sales and its carefully supervised and controlled network of authorized retailers.

28

More importantly, even if Tory Burch were correct that competitive proximity would not typically be considered in a case where there is post-sale confusion alleged, Tory Burch's products, including its jewelry items, are marketed to and purchased by different clientele than Lin & J's jewelry. Tory Burch is attempting to appeal to clients who want Tory Burch items "for the additional value they see in the products' branding and iconic logos. These customers are generally more savvy consumers with higher discretionary incomes. This type of consumer is interested in buying authentic [branded products] only," because "one of the major reasons for buying them is that they want others to know they are wearing these brands." Ex. B, Section VIII(c). Lin & J, however, sells inexpensive costume jewelry at a fraction of the prices of Tory Burch's jewelry. There is also evidence in the case indicating that Lin & J's customers sell the Isis Cross products as they are intended to be perceived, as a cross-based jewelry item. Soon Kim Dep. Trans., 125:3-19, 132:25-133:3.

Plaintiffs and Defendants do not market or sell their products to the same consumers, and thus even in a post-sale context, the individuals who would be confused (i.e., those who are familiar with and likely have bought Tory Burch) would not be consumers of Isis Cross products. *See* Ex. D, pages 13-19 (analyzing the market for both companies' products and concluding that the companies sell at non-overlapping price points through different channels of distribution to different consumers; that the two companies therefore do not compete; that Isis Cross products are not an economic substitute for Tory Burch products; and that all of the differences between the products and the ways they are manufactured, sold, and branded "allow consumers to readily distinguish between the [companies'] products").

In *Arrow Fastener Co. v. Stanley Works,* 59 F.3d 384 (2d Cir. 1995), the Second Circuit held that customers were not likely to be confused ***even when both parties sold staplers in the***

*same stores*, but one party sold a pneumatic stapler and the other a lightweight small stapler. 59 F.3d, at 396. The Court there explained that there was a significant difference in price between the two staplers, and that they served different purposes and types of customers. In the instant case, the difference in price between Plaintiffs' and Defendants' products is similarly disparate, and the respective companies serve the needs of different consumers. *See* RSUMF, ¶ 77 (calculating that Plaintiffs' alleged average wholesale prices are typically twenty times those of Defendants, though many of Plaintiffs' products sell for well more). Thus, even if Plaintiffs' statements that "Tory Burch has identified two authorized retailers of genuine Tory Burch merchandise who were also selling [Isis Cross products]" were admissible,[24] the fact that the two companies' products were being sold in two of the same locations out of thousands proves absolutely nothing. Likewise, the fact that the prices at one particular store may have been relatively close does not speak to the companies' products generally, which are far apart in product, price, place, and promotion.[25] *See* Ex. D.

In addition, in *Arrow Fastener*, the court cautioned that competitive proximity should be assessed in relation to the first two *Polaroid* factors. *Id.* As analyzed above, the first *Polaroid* factor tips, at best, only moderately in favor of Plaintiffs and the second *Polaroid* factor heavily favors Defendants. Thus, unlike a typical post-sale confusion case, competitive proximity is to be considered here, and because there is no competitive proximity here, this factor favors Defendants. At a minimum, though, there is a genuine dispute as to whether the parties are in competitive proximity.

---

[24] As noted in the RSUMF, these statements are without foundation and proper evidentiary support. These appear to be new allegations Tory Burch is foisting on Defendants after the close of Discovery.

[25] Significantly, Tory Burch does not state what occurred after Tory Burch allegedly discovered that these stores were selling both products. It is undisputed that Tory Burch maintains strict control over the product as it moves down the chain of distribution to the consumer, and there very likely was some corrective action taken by Tory Burch and the stores in question.

5.      **Whether Plaintiff Will "Bridge the Gap"**

"This factor asks if the senior user plans to encroach on the junior user's market in the future." *Perfect Pearl*, *supra*. As stated above, even assuming Plaintiffs are the senior user, Tory Burch jewelry items are marketed to and purchased by discerning consumers with high discretionary incomes, while Lin & J sells inexpensive costume jewelry. It is highly unlikely that Tory Burch would even consider placing its products in the area of the marketplace in which Lin & J resides, for this would potentially destroy Tory Burch's status as a high-end, luxury, branded fashion/costume jewelry producer. Therefore, this factor heavily favors the Defendants.

6.      **Lack of Evidence of Actual Confusion**

"For a finding of trademark infringement, it is not essential to demonstrate actual confusion. Nevertheless, there can be no more positive proof of likelihood of confusion than evidence of actual confusion." *Bulman v. 2BKCo, Inc.*, 882 F. Supp. 2d 551, 562 (S.D.N.Y. 2012). Plaintiffs typically present evidence of confusion in the form of well-designed consumer surveys, but, "in the absence of surveys, anecdotal evidence can sometimes still be used to show confusion, however it must be more than *de minimis*." *Medici Classics Prods. LLC v. Medici Group LLC*, 683 F. Supp. 2d 304, 312 (S.D.N.Y. 2010).

In the instant case, there has been insufficient evidence presented of actual consumer confusion. Plaintiffs have offered a consumer survey (hereinafter "the Rappeport survey"), but the Rappeport survey was performed with flawed methodology. *See* Ex. E; and Ex. C, § B, pages 5-9. This flawed methodology included the use of a screening process that biased the results by screening out those who didn't meet Tory Burch's definition of "fashion conscious women" and returned likelihood of confusion numbers that were much higher than the way a representative sample of the consuming public would respond. In addition, even leaving aside the biased

screening process, the Rappeport survey was flawed in its use of sample sizes that were extremely low,[26] far too low to be said to reliably represent the perceptions and attitudes of the general public. Furthermore, the Rappeport survey was flawed in its use of ineffective controls for the survey. Rappeport himself concedes that "the definition of a 'good' control stimulus is one that comes as close as possible to the test stimulus without itself being infringing; Ex. F at 8, n. 7; and yet the Rappeport survey's two controls featured highly recognizable Coach jewelry items on the one hand, and completely unrecognizable jewelry sold by Lin & J without a featured logo on the other hand. Crucially, none of these controls used any cross-based designs. How Rappeport believes these were effective controls (in that they were very far from as close possible to the test stimulus without themselves being infringing) is a true head-scratcher. Thus, for several reasons, the Rappeport survey cannot be admitted as evidence of likelihood of confusion.

Tory Burch also cites communications from a purported United States Customs and Border Protection agent and a New York City Police Department Peddler Task Force officer. These appear to be rather haphazardly done correspondence and even if they were admissible, certainly cannot be considered reasoned, deliberate determinations by government agencies. *See* RSUMF ¶¶ 139-140. The case Plaintiffs' cite in support, *Philip Morris USA Inc. v. C.H. Rhodes, Inc.*, is distinguishable from the instant case on a number of grounds, including that the decision was entered upon a motion for default judgment in *Philip Morris* whereas Lin & J vigorously denies any and all allegations of infringement and that the letter in *Philip Morris* appeared to

---

[26] These sample sizes were initially 108 who were tested with 2 of the 3 Tory Burch designs at issue, 108 who were tested with the Isis Cross Design, and 108 who were tested with the predecessor mark. These sample sizes are inadequate to individually be said to reliably represent the perceptions and attitude of the target population, as even Plaintiffs' survey expert concedes that 150-200 respondents is what experience has shown him yields the minimum reliable sample. Ex. F, p. 6. Plaintiffs' survey expert then reduced to 51, 65, and 55 the relevant sample sizes, after screening out the large percentage of respondents who had never heard of Tory Burch. Given these clearly biased techniques, this survey cannot be regarded as admissible evidence of likelihood of confusion.

have been sent pursuant to a formal seizure process whereas the email communications here appear to have been sent subject to time pressure and without having taken a full opportunity to investigate the matter. Case No. 08 CV 0069, 2010 WL 119612, at *3 (E.D.N.Y. Mar. 26, 2010).

Plaintiffs also have not identified even a single instance of a consumer purchasing a Lin & J Isis Cross product and believing it originated from Tory Burch.[27] RSUMF, ¶ 107. Plaintiffs have not identified a single individual, let alone some portion of the public, who would have bought a genuine Tory Burch product had that individual or group not purchased an Isis Cross product. *Id.* The fifth *Polaroid* factor weighs prominently on Defendants' side of the ledger.

### 7.  **Bad Faith**

"The intent factor looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Medici, supra* (internal quotation marks omitted). Generally, "issues of good faith are inappropriate for determination on summary judgment;" *Pfizer Inc. v. Astra Pharmaceutical Prods.*, 858 F. Supp. 1305, 1326 (S.D.N.Y.1994).

"Intent is largely irrelevant in determining if consumers likely will be confused as to source. The history of advertising suggests that consumer reactions usually are unrelated to manufacturer intentions." *Girl Scouts of United States v. Bantam Doubleday Dell Publishing Group, Inc.*, 808 F. Supp. 1112, 1128 (S.D.N.Y.1992) (citing *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986).

---

[27] Plaintiffs argue that the fifth *Polaroid* factor favors Plaintiffs because they detected some of Lin & J's customers and customers' customers reselling Isis Cross products while describing them as "designer inspired" or "Tory Burch inspired." However, there are at least two reasons why this cannot be considered evidence of actual confusion: (1) the very fact that they were being promoted as "designer inspired" or "Tory Burch inspired" means that all parties involved (seller, purchaser and detective) were clear that these were not actually Tory Burch products; and (2) they were a miniscule percentage of total sales of Isis Cross products and therefore a *de minimis* amount. *Medici, supra.* Also, the Ellias Report makes clear that simply selling products "in the style of" or "inspired by" a famous designer is not in itself infringing or evidence of bad faith according to jewelry industry custom. *See* Ex. B, Section VII(d). Tory Burch itself sells many jewelry pieces that have been heavily inspired by previous designer trends. *See* Ex. B, Section VI. *See* RSUMF, ¶ 97.

Though Plaintiffs plead it, bad faith in the introduction of the accused infringing marks to satisfy this *Polaroid* factor is simply not present here. President Kim has certified that she personally developed the Isis Cross Design based on styles created by her father and to which she was exposed in South Korea; based on the predecessor mark; and based on the Coptic cross and fleur-de-lis, age-old symbols that hold deep meaning to Christian sects around the globe. That certification is entirely consistent with the rest of the record, which shows that Defendants' predecessor mark predates even the earliest of Plaintiffs' designs. Plaintiffs have not, to date, specifically disputed this beyond blanketly labeling Isis Cross products "Counterfeit Jewelry" and "Accused Infringing Products."

Plaintiffs attempt to piece together bad faith in the adoption of the mark from the evidence they have introduced to support their Motion for Sanctions. *See* Dkt. Nos. 133-134. However, those allegations of bad faith largely do not bear on the question at hand. Even if the Court were to find that Defendants intentionally attempted the deceive the USPTO and the Court by creating false documents showing early use of the Isis Cross Design as a trademark, that is not relevant to the question of whether Defendants adopted the marks in question to profit off Tory Burch's reputation. Similarly, even if the Court were to find that Defendants did not properly preserve and made alterations to invoices, that does not lead to the conclusion that Lin & J introduced its Isis Cross products, including products that were sold prior to Tory Burch's first use in commerce, with bad faith and by intending to capitalize on Plaintiffs' reputation and goodwill in its marks.

Plaintiffs will also likely seek to make out a case for bad faith by pointing to certain Lin & J invoices to customers that bear the description "Tory Burch Style Stretch Ring" for item RT31. However, descriptions for items that appear on invoices are not closely scrutinized by Lin

& J, which pays much closer attention to the item number and color code and does not place much importance in the description. Kim Dep. Trans., 591:24-592:8. Instead, interns or others taking an order from a customer, if they are not given direction from a supervisor, would take liberty to enter descriptions they thought could superficially describe the product. Kim Dep. Trans., 591:12-20. Though Tory Burch seems to ascribe importance to the product descriptions on these invoices, when President Kim discovered these misguided descriptions, she changed them to reflect the proper name of the product, not for any malicious reason. Kim Dep. Trans., 592:22-593:9, 597:3-11. The simple fact that an intern may have entered an incorrect description on a handful of invoices, which the customers did not see until receiving the product, does not lead to the conclusion that Lin & J was actually marketing and selling its products as "Tory Burch style," let alone lead to the conclusion that it was selling as genuine "Tory Burch."

In addition, if Defendants had intended to capitalize on Tory Burch's reputation and goodwill, they would have, and easily could have, created a design that closely mimicked Tory Burch's well known T over T. Ex. B, § X(b).  Plaintiffs have not satisfied their burden in terms of establishing bad faith on the part of Defendants.

### 8.    <u>The Disparate Quality of the Parties' Products</u>

"Under this factor, a court 'examines whether defendant's products or services are inferior to plaintiff's, thereby tarnishing plaintiff's reputation if consumers confuse the two.'" *GoSmile, Inc. v. Levine*, 769 F. Supp. 2d 630, 646 (S.D.N.Y. 2011).

Again, as explained above, Tory Burch jewelry items are marketed to and purchased by high-end customers while Lin & J sells inexpensive costume jewelry.  Although Lin & J is proud of the design and quality of its products, they are not in the same category as Tory Burch's, and Plaintiffs clearly consider it tarnishing of their reputation should consumers confuse the two.

However, because, as described above, the designs are so different and particularly because the difference in quality between the two parties' products is readily apparent, there is little if any chance they would be confused and this factor is irrelevant.

### 9. Consumer Sophistication

The final *Polaroid* factor, that of the level of sophistication of the consumer, "considers the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Star Indus. v. Bacardi & Co.*, 412 F.3d 373, 390 (2d Cir. 2005). Courts have held that, generally speaking, "the greater the value of an article the more careful the typical consumer can be expected to be" in purchasing it. *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1137 (2d Cir. 1979). Courts also tend to be distinguishing in examining not only the industry in which the goods were sold, but also with regard to the class(es) of typical consumers and with regard to the cost relative to other, similar products sold in the industry. *See Perfect Pearl, supra.*

In the instant case, Lin & J is a manufacturer of entry-level, low-cost costume jewelry selling primarily to distributors, wholesalers and retailers, and to very few consumers directly through its website. Tory Burch, according to the Second Amended Complaint, sells "high quality" jewelry bearing its trademark through "a carefully controlled network of authorized retailers, including high-end department stores, select quality boutiques, as well as more than seventy Tory Burch retail boutiques and Tory Burch's Internet web store located at www.toryburch.com."

Tory Burch's customers are highly sophisticated consumers with substantial discretionary incomes and are not looking to save money when they buy Tory Burch products. As explained above, Tory Burch's customers are interested in purchasing *authentic Tory Burch products only*,

36

because wearing Tory Burch jewelry is a status symbol, an indication that the wearer can afford the luxury fashion brand. As such, they are likely to be very discerning as to which products and what quality they are buying, especially if they are being asked to purchase at discounted rates.[28]

The same is true even in a post-sale context, where consumers are likely to already be Tory Burch customers. Tory Burch customers are of a higher discretionary income and are seeking genuine Tory Burch jewelry products only. In addition, the idea that Plaintiffs put forth, that consumers in the post-sale context will not likely have the opportunity to closely inspect the jewelry to determine its origin contradicts Plaintiffs' assertion that Tory Burch would be harmed in a post-sale scenario. If consumers are not taking the time to examine the product even a little such that they do not realize that it is a lower quality product that Tory Burch offers, even if they believe it is a Tory Burch product, Tory Burch's brand will not have been harmed because no negative association between the product and Tory Burch's brand will have been made.

Given the sharp disparity in the prices of Plaintiffs' and Defendants' products, given the fact that the marks at issue are easily distinguishable by sight, and given the obvious difference in quality, there is little chance that consumers would confuse Lin & J products as Tory Burch even in a post-sale context. Also, given that Tory Burch is a well-known designer name and that it "carefully control[s]" its "network of authorized retailers" (who undoubtedly publicize that they are authorized resellers of Tory Burch jewelry), it is hard to believe that consumers of "high quality" jewelry, "buying under the normally prevalent conditions of the market," would confuse Lin & J's inexpensive and clearly labeled equal-sided Isis Cross products as having been produced by Tory Burch. Thus, the final *Polaroid* factor weighs in favor of Defendants.

---

[28] Any purchaser of Tory Burch products would likely know that genuine Tory Burch products could not be purchased for the prices for which Isis Cross products are sold.

As demonstrated above, the factors weigh strongly in favor of Lin & J, even in the post-sale context that is more favorable to Tory Burch's outrageous claims.

**10.**     **Cause of Minimal Confusion**

At the same time, Defendants recognize that there is some minimal level of confusion witnessed. *See* Ex. C, § C(4)(d) (finding 0%-8% confusion). Tory Burch has claimed that the confusion is more than minimal and that it is the result of Lin & J's conduct, but the reality is that Tory Burch is the one responsible for any confusion witnessed. Belco, the company previously run by Youngran Kim, undisputedly used the predecessor mark, which indisputably is a cross-based design, in commerce well before Tory Burch used its oldest mark in commerce. Similarly, Tory Burch has gone out of its way to include crosses in its designs and to oppose Lin & J's Isis Cross Design trademark application **based on the fact that its own T over T logos are crosses**. Fig. 2; Ex. R, ¶ 10. Thus, to the extent that there is any confusion here, such is the result of reverse confusion, "the misimpression that the junior user is the source of the senior user's goods." *Banff, Ltd. v. Federated Dep't Stores*, 841 F.2d 486, 490 (2d Cir. 1988).

The reason this is such an unusual case, however, is that this reverse confusion is not between Lin & J's marks and Tory Burch's, but rather between Tory Burch's and the ancient and revered equal-armed cross generally, different variations of which Tory Burch has used and is still using in connection with its products.[29] Defendants respectfully submit that Lin & J should not be found liable for infringement where it is the Plaintiffs that are causing the confusion.

**CONCLUSION**

---

[29] This is what Defendants realized at the end of the accelerated Discovery schedule and what prompted the withdrawal of the trademark infringement counterclaim.

For the foregoing reasons, the record raises triable issues of fact as to each of the claims on which Plaintiffs have moved for summary judgment. Accordingly, Tory Burch's Motion for Summary Judgment should be denied, and this case should be scheduled for trial.

Dated: Fort Lee, New Jersey
October 2, 2014

Respectfully submitted,

By: /s/Howard Z. Myerowitz, Esq.
HOWARD Z. MYEROWITZ, ESQ. (HM0972)
Song Law Firm, LLC
400 Kelby Street, 7th Floor
Fort Lee, New Jersey 07024
(201) 461-0031
**Attorneys for Defendants**
**Lin & J International, Inc.,**
**Youngran Kim, LJ Brand, Inc., and**
**NJ Lin & J International, Inc.**

<u>**CERTIFICATION OF SERVICE**</u>

I hereby certify that on October 2, 2014, the foregoing document was served via USPS

upon the following parties:

> Natalie L. Arbaugh, Esq.
> Michael Bittner, Esq.
> Fish & Richardson, P.C.
> 601 Lexington Ave., 52th Floor
> New York, NY 10022-2611
> Tel: (212) 765-5070
> Fax: (212) 258-2291
> E-mail: arbaugh@fr.com
> E-mail: bittner@fr.com
> *Attorneys for Plaintiffs*

By:  /s/ Howard Z. Myerowitz
> Howard Z. Myerowitz, Esq. (HM0972)
> SONG LAW FIRM LLC
> Attorneys for Defendants
> 400 Kelby Street, 7th Floor
> Fort Lee, NJ 07024
> (201) 461-0031
> HMyerowitz@SongLawFirm.com
> *Attorneys for Defendants*