UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
RIVER LIGHT V, L.P. and TORY BURCH  :
LLC,                                :
                                    :
                Plaintiffs,         :
                                    :        13cv3669 (DLC)
        -v-                         :
                                    :        OPINION & ORDER
LIN & J INTERNATIONAL, INC., YOUNGRAN :
KIM, LJ BRAND, INC., and NJ LIN & J :
INTERNATIONAL, INC.,                :
                                    :
                Defendants.         :
------------------------------------ X

APPEARANCES:

For Plaintiffs River Light V, L.P. and Tory Burch LLC:

Natalie L. Arbaugh
Michael A. Bittner
FISH & RICHARDSON PC
1717 Main St., Ste. 5000
Dallas, TX 75201

Irene E. Hudson
FISH & RICHARDSON PC
601 Lexington Ave., 52nd Fl.
New York, NY 10022

For Defendants Lin & J International, Inc., Youngran Kim, LJ
Brand, Inc., and NJ Lin & J International, Inc.:

Howard Z. Myerowitz
SONG LAW FIRM LLC
400 Kelby St., 7th Fl.
Fort Lee, NH 07024

DENISE COTE, District Judge:

     Plaintiffs River Light V, L.P. and Tory Burch LLC

(together, "Tory Burch" or "Plaintiffs") bring this action for

counterfeiting and trademark infringement, among other things,

against defendants Youngran Kim ("Kim") and three companies she controls, Lin & J International, Inc., LJ Brand, Inc., and NJ Lin & J International, Inc. (together, "Lin & J," and with Kim, "Defendants"). Tory Burch now moves for summary judgment on these two claims. For the reasons that follow, Tory Burch's motion is granted in part.

**BACKGROUND**

The facts below, drawn from Tory Burch's submissions in support of the instant motion and a prior motion for sanctions, are undisputed.[1]  All reasonable inferences are drawn in Defendants' favor, as non-movants.

## I.   Tory Burch

Tory Burch is a well-known fashion brand. Tory Burch opened its doors in 2004; it now has 120 stores across the world, including more than 60 in the United States, and its fashion line appears in more than 3,000 department and specialty stores worldwide.

### A.   Tory Burch Logo

Tory Burch's products typically feature prominently one of several variations on its logo, which is composed of two stylized letter "T"s, one upside-down and stacked atop the other, forming a cross-like figure (the "T-over-T Design").  The

---

[1] As explained below, Defendants' opposition to this motion was stricken.

original TT Logo was created in 2003 by a brand development
company, MODCo Creative, LLC, with direction from Tory Burch's
eponymous founder ("Ms. Tory Burch").  It features a T-over-T
Design inscribed within a circle (the "TT Logo"), as pictured
here:



Since 2004, the TT Logo has been used continuously by Tory Burch
as a source identifier on its products, packaging, hangtags,
labels, shopping bags, gift boxes, stationary, and storefronts,
as well as in its patterns, products, marketing and promotional
materials, and advertisements.

     In late 2008, Tory Burch designed sunglasses featuring the
TT Logo split between the end pieces of the glasses and the stem
of the sunglasses' arms (called "temples"), as pictured below:



The fold between the end pieces and temples created a vertical
split within the TT Logo ("Split TT Logo").  After these

sunglasses were first sold in 2009, Tory Burch began using the
Split TT Logo on other Tory Burch products.  Since 2009, Tory
Burch has used the Split TT Logo to identify the source of the
products on which it appears, including jewelry, clothing, and
accessories.  Tory Burch has also continuously used the T-over-T
Design without a circle (the "Bare TT Logo") on a variety of
products, including jewelry, to identify Tory Burch as the
source.  Since at least January 15, 2006, Tory Burch has used
the "Tory Burch" word mark on products including jewelry to
identify its source.

     B.    **The Popularity of Tory Burch's Brand**

     Tory Burch has invested hundreds of millions of dollars in
developing, advertising, and promoting Tory Burch products
featuring the TT Logo.  Tory Burch has a major presence on a
variety of social media platforms -- for instance, the Tory
Burch brand has more than one million "likes" on Facebook.  Tory
Burch has generated many millions of dollars each year since
2007.  The Tory Burch brand has been featured on Oprah Winfrey's
talk show and the television series "Gossip Girl" and has been
worn by celebrities including Beyonce Knowles-Carter, Cameron
Diaz, the Duchess of Cambridge Catherine Middleton, and First
Lady Michelle Obama.  In 2008, Ms. Tory Burch won the
Accessories Designer of the Year award from the Council of
Fashion Designers of America.  In the last two years, Forbes has

referred to the TT Logo as "iconic" and "distinctive," the <u>New York Times</u> has called the TT Logo "near-ubiquitous," and the <u>Wall Street Journal</u> has noted the TT Logo is "as instantly recognizable as those of brands established generations prior."

**C.   Tory Burch Trademarks**

In September 2003, Tory Burch filed a trademark application with the United States Patent and Trademark Office ("PTO") for use of the TT Logo on jewelry, handbags, clothing, and accessories.  The application claimed a first use in commerce date of February 1, 2004.  This trademark was registered on December 13, 2005 and received registration number 3,029,795 (the "TT Logo Trademark"); Tory Burch has used this mark continuously since 2004.  Since then, Tory Burch has received ten other trademarks for use of the TT Logo in connection with goods ranging from socks to leather key chains to dog collars to cell phone cases.  Tory Burch has not filed a trademark application with the PTO for use of the Split TT Logo on jewelry, although Tory Burch has applied for and received four trademark registrations for the Split TT Logo in connection with other goods, including eyewear.  Tory Burch applied for a trademark of the Bare TT Logo for use in connection with jewelry on August 30, 2012, citing a first use in commerce date of January 31, 2011.  This trademark was registered with the PTO on July 9, 2013 and received registration number 4,363,739 (the

"Bare TT Logo Trademark").  Tory Burch also received a
registered trademark in the "Tory Burch" word mark in connection
with jewelry on May 13, 2008, with a first use in commerce date
of January 16, 2006 and registration number 3,428,816 (the
"'Tory Burch' Trademark").  Tory Burch also owns copyright
registrations for the TT Logo and Split TT Logo.[2]

### D.   Sales Channels

Tory Burch maintains strict quality control standards over
its products, and sales of authentic Tory Burch products are
limited to a network of authorized retailers including high-end
department stores, quality boutiques, Tory Burch's own
storefronts, and Tory Burch's online store.  Tory Burch jewelry
retails for between $78 and $450.  Tory Burch products are
marketed to a wide range of consumers, predominately women, in
all different age groups and demographics.

## II.  Lin & J

Kim created Lin & J International, Inc. in 2005, and LJ
Brand, Inc. and NJ Lin & J International, Inc. in 2013.  All
three remain wholly owned and controlled by Kim.  Defendants
manufacture, promote, and sell fashion jewelry including
earrings, necklaces, pendants, cuffs, bangles, and bracelets.
Kim herself chooses what Defendants sell, including the Accused

---

[2] U.S. Reg. No. VA 1-768-387 (TT Logo); U.S. Reg. No. VA 1-880-129 (Split TT Logo).

Products, and authorized the sales of the Accused Products.
Each Lin & J entity sells the Accused Products in wholesale and
retail channels, in storefronts and online.  Third-party
retailers who purchase the Accused Products wholesale sell them
both in storefronts and online.

The Accused Products bear one of two designs.  Defendants
call the first the "Isis Cross Design"; it is pictured below.



The second is the so-called "Predecessor Design," pictured here:



In a counterclaim for trademark infringement (the "Trademark
Counterclaim"), Defendants asserted that Tory Burch products
"bear[] . . . and infring[e] on Lin & J's Isis Cross design
trademark" and that "Tory Burch's use of the Isis Cross design
is likely to lead to and result in confusion, deception and

mistake in the minds of consumers, the public and the trade" and "is likely to create a false impression and deceive customers, the public and the trade into believing that Lin & J has infringed on . . . Tory Burch's trademark."

A number of the Accused Products closely resemble Tory Burch jewelry not just in their use of the Isis Cross Design or Predecessor Design, but in all respects.  Below, pictures of genuine Tory Burch jewelry appear on the left; pictures of similar Lin & J products appear on the right.

**Tory Burch**        **Lin & J**

Defendants have sold more than 1.5 million of the Accused Products to at least 420 direct customers, including wholesalers, distributors, and retailers, and nearly all of that between 2012 and the present.  Defendants' sales of the Accused Products were approximately $523,000 in 2012, $2.3 million in 2013, and $1.1 million between January 1, 2014 and June 30, 2014.

Kim claims the Accused Products are "high quality fashion accessories" and "high quality jewelry."  She identifies the ultimate consumers of the Accused Products as "a wide range of women . . . in all different age groups and demographics."

In their invoices, Defendants have referred to one of the Accused Products, pictured below, as the "Tory Burch Style Stretch Ring."



One of Defendants' customers, C & L Trading of Miami, described the Accused Products as "T.B. Cross" in purchase orders.  For instance, in a purchase order dated January 6, 2013 for hundreds of the Accused Products, each of the item descriptions begins with "T.B. Cross," and includes products like "T.B. CROSS LEATHER WIDE BRACELET," "T.B. CROSS W/ STONE EARRINGS," and "T.B. CROSS 30 [INCH] LONG NECLACE [sic] SET."  Tiffany Walden ("Walden"), Tory Burch's Senior Counsel -- Director of Intellectual Property and Brand Enforcement, has identified 213 retailers who have referred to Tory Burch in marketing the Accused Products.

**III. Surveys**

Tory Burch hired RL Associates, a survey research and consulting firm, to study the extent to which women were

confused as to the source of the Accused Products.[3]  RL
Associates' study (the "Tory Burch Survey") surveyed women
between the ages of 21 and 59 who said they were interested in
women's fashion and regularly read a women's fashion magazine or
blog.  The Tory Burch Survey found that 26% of respondents, and
57% of respondents who reported having heard of Tory Burch,
identified Tory Burch as the source of authentic Tory Burch
jewelry.  31% of respondents, and 53% of respondents who had
heard of Tory Burch, identified Tory Burch as the source of the
Accused Products bearing the Isis Cross Design.  25% of
respondents, and 51% of respondents who had heard of Tory Burch,
identified Tory Burch as the source of the Accused Products
bearing the Predecessor Design.  Tory Burch's expert concluded,
on the basis of the Survey, that there is a strong likelihood,
in the post-sale context, that the source of the Accused
Products would be misidentified as Tory Burch.

---

[3] Tory Burch has submitted a second expert report, authored by
Dr. Russell Mangum, concluding that Tory Burch suffered
substantial lost profits from Defendants' sale of the Accused
Products.  Tory Burch has also submitted Defendants' expert
rebuttal report, authored by Dr. Warren J. Keegan ("Keegan").
Keegan concludes that the Accused Products are not similar to
Tory Burch products and do not compete with Tory Burch products,
as the Accused Products are "low cost entry-level costume
jewelry" of "limited quality" while Tory Burch jewelry is
"finely manufactured . . . [and] of high quality."

**IV.  Tory Burch Discovers Defendants' Operation**

Tory Burch polices its intellectual property, including the trademarks referenced above, through investigations into possible counterfeiters, serving enforcement letters, filing law suits, and cooperating with law enforcement and customs to seize counterfeit goods.  Walden conducts such investigations into possible counterfeit goods.

In the summer of 2012, Walden began to notice an increasing number of retailers and e-retailers selling jewelry not produced or authorized by Tory Burch bearing designs similar to the Split TT Logo and describing this jewelry as "Tory Burch," "Tory Burch Logo," "Tory Burch knockoff," "Tory," and "TB."  As Walden would later discover, much of this jewelry had been produced by Defendants and is described above as the Accused Products.  This trend continued in 2013.  Google Image searches for "Tory Burch" plus a type of jewelry (e.g., "earrings" or "bangle bracelet") were generating dozens of images of the Accused Products.  In some instances, the Accused Products appeared as the first search results in a Google Image search, ahead of genuine Tory Burch jewelry.

Walden uncovered a number of users promoting the Accused Products on various social media platforms.  While monitoring Facebook, Walden discovered more than 70 Facebook users promoting the Accused Products.  Walden also found eighteen

12

Pinterest users promoting the Accused Products and describing them as "Tory Burch" jewelry.  Some of these promotional "pins" were then "repinned" by other Pinterest users -- in one case, by 1,700 other users.  Surveillance of Instagram turned up 41 Instagram users promoting the Accused Products and describing them as "Tory Burch" or "Tory Burch inspired" jewelry. Similarly, monitoring of eBay and Etsy uncovered dozens of users promoting the Accused Products and describing them as "Tory Burch" or "Tory Burch inspired."

In addition, Walden found 64 online stores selling the Accused Products, many of which described them as "Tory Burch" or "Tory Burch inspired" jewelry.  Storefronts, including the retailers Curlz & Dots Monogramming, Molly and Zoey, Silhouette Boutique, and Haute Pink Boutique, were also selling the Accused Products and referring to them as "Tory Burch" or "Tory."  All told, Walden has found 213 retailers selling the Accused Products, many of which refer to the jewelry as "Tory Burch" or "Tory."

In at least one case, the Accused Products have been advertised by a retailer under the TT Logo.  At least two retailers, Closet Envy and Monkee's, have sold both authentic Tory Burch products and the Accused Products.  Closet Envy advertised the Accused Products as "knock off Tory Burch" products.

The Accused Products generally retail for between $10 and $30.  In some cases, the retail price of the Accused Products is quite close to the retail price of Tory Burch jewelry it resembles.  For example, an unauthorized necklace manufactured by Defendants was sold for $42 and unauthorized earrings produced by Defendants was sold for $32 at Closet Envy.

On March 3, 2013, Walden sent the retailer Jewelria an enforcement letter after an investigator purchased certain Accused Products from Jewelria.  Jewelria responded, identifying defendant Lin & J as one of its two suppliers.  In a March 27, 2013 e-mail to Walden, counsel for Jewelria advised that Lin & J had told Jewelria it "has some arrangement with [Tory Burch] that allows the sale of the products it manufactures to be sold."  No such arrangement existed.

On April 29, 2013, Walden sent an enforcement letter to retailer Sam Mi Wholesale ("Sam Mi") after an investigator purchased certain Accused Products from Sam Mi.  After receiving this letter, Soon Kim, an employee of Sam Mi, contacted Lin & J, the supplier of Sam Mi's Accused Products.  Lin & J then provided Sam Mi with false invoices that substantially understate the amount of Unauthorized Jewelry sold by Lin & J to Sam Mi and change the product description for certain items from "Isis Cross" -- which Tory Burch had identified as an infringing design -- to "Snowflake."

14

On May 6, 2013, an agent from the United States Customs and Border Protection ("U.S. Customs") e-mailed Walden to advise that Lin & J's Accused Products had been seized, as they "appear to be of very low quality and with [the officer's] expertise in handling all types of commodities . . . looks counterfeit."  On March 19, 2014, an officer on the New York City Police Department Peddler Task Force e-mailed Walden to advise that Lin & J Accused Products had been seized, as "[t]hey look close to Tory Burch."

## V. Spoliation & Fabrication of Evidence by Defendants

In the fall of 2012, Kim learned that Tory Burch had sent cease-and-desist letters to Lin & J clients.  Kim then contacted the law firm of Troutman Sanders LLP to discuss applying to register a trademark.  On January 30, 2013, Kim filed two trademark applications through Troutman Sanders.  The first was for the logo Kim had been using to identify Lin & J products to date -- on banners and hangtags, for example (the "Isis Creative Logo").  That logo bears no resemblance to the TT Logo.[4]  The second application was for the Isis Cross Design (the "Isis Cross Application").  The specimen submitted to the PTO in

---

[4] The PTO rejected the application to trademark the Isis Creative Logo on April 3, 2013, citing the likelihood of confusion with other registered marks.  Lin & J has abandoned that application.

support of the Isis Cross Application is pictured with a hangtag
bearing the Isis Creative Logo.

On May 16, 2013, the PTO rejected the Isis Cross
Application, finding that Lin & J had not used the Isis Cross
Design as a trademark identifying the source of its goods, but
instead as "merely a decorative or ornamental feature of the
goods/packaging of the goods."  Two weeks later, on May 31, Tory
Burch filed the instant suit.  Defendants were served on June 3.
Shortly afterward, Kim hired the Song Law Firm to handle
Defendants' defense, as well as the Isis Cross Application.
Sometime in 2013, Kim created LJ Brand, Inc. to sell products
bearing the Isis Cross and a new website, www.isiscross.com.

On July 18, Defendants filed their answer and
counterclaims, including the Trademark Counterclaim alleging
that the TT Logo infringed Defendants' trademark in the Isis
Cross.  Two days before, Defendants made substantive
modifications to sixteen invoices from 2009 that they
subsequently produced to Tory Burch as evidence of sales of Isis
Cross products.

On August 15 and 16, 2013, Kim fabricated four collection
books prominently featuring Isis Cross products and the Isis
Cross Design that purport to be from 2009, 2010, 2011, and 2012
(the "False Collection Books").  The False Collection Books
include pages welcoming customers to Lin & J.  The majority of

16

the digital images of Isis Cross products used to create the False Collection Books were taken on August 15 or 16.  On August 16, the initial pretrial conference was held in this action.  At that conference, counsel for Defendants represented that they had been using the Isis Cross Design in jewelry since 2003.

On September 3, 2013, Lin & J submitted new specimens to the PTO in support of the Isis Cross Application, including the False Collection Book for 2012.  The specimens also include pictures of the storefront of Wona Trading showing Isis Cross products sold under an Isis Cross sign.  Those pictures were staged by Lin & J.  Lin & J employees asked Wona Trading to briefly place the Isis Cross sign in its storefront to permit Lin & J to take pictures, explaining that Lin & J was being sued by Tory Burch for counterfeiting.  The sign was removed immediately after Lin & J's pictures were taken.  The Isis Cross Application continued to assert the Isis Cross Design was first used in commerce as of January 19, 2009.  Kim admits she was warned that "willful false statements" were punishable by fine or imprisonment.

On October 8, 2013, to assist in mediation, Lin & J produced limited discovery purporting to evidence the history of its use of the Isis Cross Design.  In that discovery, Lin & J produced invoices from 2005 to 2013.  Lin & J produced -- and has to this day produced -- only a single invoice showing the

sale of an Isis Cross product for each of the years 2005, 2006, and 2007, and few invoices for years prior to 2012.  A later forensic examination of Defendants' invoices revealed that all of these invoices dated before December 22, 2011 had been substantively modified years after the date they were created. In many of these invoices, the Isis Cross product appears at the bottom of the invoice.  An examination of Defendants' invoicing system established that items added to an invoice after-the-fact would be added to the bottom of the invoice.

On January 31, 2014, Defendants produced the remainder of the relevant invoices to Tory Burch.  A later forensic examination of those invoices showed that many of those invoices had been substantively modified on December 17 or December 31, 2013.  Many invoices listing "Filigree" or "Snowflake" as the final item were last substantively modified on December 17; many invoices listing "Tory Burch Style Stretch Ring" were last modified on December 31.  Defendants produced the original Sam Mi invoices, not the modified invoices.  Defendants also produced all four of the False Collection Books without noting that they had been created years after the years from which they purport to date.

In April 2014, Tory Burch served Lin & J customers identified in the Lin & J invoices with subpoenas requesting the customers' copies of those invoices.  The invoices produced by

Lin & J's customers do not match Lin & J's invoices for years before 2012, as they do not show the purchase of Isis Cross products.

The parties agreed to hire neutral forensic computer expert Andrew Donofrio ("Donofrio") to collect the native files corresponding to Lin & J's invoices from Lin & J's computer system.  Donofrio visited Lin & J's office and collected these files on April 30, 2014.  He found that many of these invoices had been last substantively modified the day before, on April 29.  The earliest invoice produced by Lin & J that was not substantively modified after its creation is dated December 22, 2011.  Donofio returned on July 1 to test Lin & J's invoicing system to determine what actions change the "last modified" date for invoices.  He determined that only substantive actions that change the invoice data alter that date.  Viewing, exporting, or printing invoices does not alter that date.  Tory Burch's own expert, Andrew Rosen ("Rosen"), reviewed the data collected by Donofrio and confirmed his conclusions.

## VI.  Sanctions

Tory Burch moved for sanctions on August 29, 2014, citing Defendants' spoliation of invoice data and fabrication of evidence including the False Collection Books.  Defendants voluntarily dismissed their Trademark Counterclaim on September 5.  A hearing was held on November 4 and November 5.

The Court found that Defendants had altered the invoice data and produced falsified invoices and the False Collection Books to Tory Burch in order to, at the very least, fabricate evidence of use of the Isis Cross Design prior to December 22, 2011.  Defendants agreed that their remaining counterclaims, as well as certain affirmative defenses, were related to the spoliation and fabrication of evidence.  Accordingly, the Court held Defendants would not be permitted to introduce this evidence and that a jury would be entitled to an instruction advising it of Defendants' spoliation and fabrication of evidence.  The Court dismissed Defendants' remaining counterclaims with prejudice and struck the affirmative defenses relating to the tainted evidence.  In addition, Tory Burch was granted costs and fees incurred in uncovering Defendants' spoliation and fraud on the Court, bringing the motion for sanctions, and litigating Defendants' counterclaims, among other things.

## VII. Defendants' Summary Judgment Opposition Papers

On September 10, 2014, Tory Burch brought the instant motion for summary judgment on its claims for counterfeiting and trademark infringement.  Defendants' opposition was due September 29.  On September 29, Howard Myerowitz ("Myerowitz"), counsel for Defendants, requested, on consent, an extension to October 1.  He represented that his computer system crashed over

20

the weekend.  The Court granted the request.  On October 1,
Myerowitz requested an extension to October 2.  The Court again
granted the extension but noted the October 2 deadline was firm.

On October 3, Tory Burch wrote the Court to advise that
Myerowitz had not served them with Defendants' opposition papers
(the "Opposition Papers").  On October 6, Myerowitz filed a
letter with the Court representing that he had confirmed with
his paralegal that the Opposition Papers had been mailed to Tory
Burch on October 2.  Later that day, Tory Burch wrote the Court
with further evidence that the Opposition Papers had not been
mailed on October 2: a mailing label showing the package
containing the Opposition Papers had departed Newark Liberty
International Airport at 7 a.m. on October 5.  In a letter to
the Court of October 7, Myerowitz maintained his story and
chastised Tory Burch's counsel for making "outrageous and
baseless accusations."

Following receipt of Myerowitz's letter of October 7, the
Court entered an Order finding good cause to believe he had
misrepresented the mailing date.  The Court ordered a forensic
examination of Myerowitz's computer system to determine when the
Opposition Papers were completed and set a hearing date.

On October 9, Myerowitz wrote the Court to admit that
Defendants' Opposition Papers were mailed on October 3, not
October 2, and to apologize for his repeated misrepresentations.

At a hearing on November 6, the evidence showed that Myerowitz was composing the Opposition Papers through the afternoon of October 3, knew the Opposition Papers were mailed on October 3, and knowingly misrepresented their mailing date to the Court.

Despite the fact that the Opposition Papers were untimely and Defendants' counsel had lied to the Court to hide this fact, the Court permitted Defendants an opportunity to submit a redline of the Opposition Papers, excising all passages that referred to evidence tainted by Defendants' spoliation and fabrication.  Defendants submitted a redline on November 6 that continued to rely on such evidence.  Accordingly, by Order of November 12, Defendants' Opposition Papers were stricken.  As a result, Tory Burch's motion is unopposed.

**DISCUSSION**

**I.   Summary Judgment Standard**

Summary judgment may not be granted unless all of the submissions taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party.  Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992); Holcomb v. Iona Coll., 521 F.3d

130, 132 (2d Cir. 2008).  Once the moving party has asserted
facts showing that the non-movant's claims cannot be sustained,
the opposing party must "set out specific facts showing a
genuine issue for trial," and cannot "rely merely on allegations
or denials" contained in the pleadings.  Fed. R. Civ. P. 56(e);
see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  Nor
may a party "rely on mere speculation or conjecture as to the
true nature of the facts to overcome a motion for summary
judgment," as "[m]ere conclusory allegations or denials cannot
by themselves create a genuine issue of material fact where none
would otherwise exist."  Hicks v. Baines, 593 F.3d 159, 166 (2d
Cir. 2010) (citation omitted).  "A submission in opposition to
(or in support of) summary judgment need be considered only to
the extent that it would . . . be[] admissible at trial."  Doe
ex rel. Doe v. Whelan, 732 F.3d 151, 157 (2d Cir. 2013)
(citation omitted).  Only disputes over material facts -- "facts
that might affect the outcome of the suit under the governing
law" -- will properly preclude the entry of summary judgment.
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

     Even when a summary judgment motion is unopposed, a court
may not "automatically grant summary judgment."  Jackson v. Fed.
Exp., 766 F.3d 189, 194 (2d Cir. 2014).  "Before summary
judgment may be entered, the district court must ensure that
each statement of material fact is supported by record evidence

sufficient to satisfy the movant's burden of production," and "the court must determine whether the legal theory of the motion is sound."  Id.

## II. Trademark Infringement Claim

Trademark infringement claims under Sections 32 or 43(a) of the Lanham Act are analyzed in two stages.  Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc., 696 F.3d 206, 216 (2d Cir. 2012).  First, plaintiff must establish that its mark is entitled to protection.  Id.  Once a plaintiff proves the mark is entitled to protection, the plaintiff must then show that the "defendant's use of a similar mark is likely to cause consumer confusion."  Id. at 217 (citation omitted).

Section 32(1)(a) of the Lanham Act grants the registrant of a trademark a cause of action against any person who, without the registrant's consent,

> use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

15 U.S.C. § 1114(a)(1).  Section 43(a)(1) of the Lanham Act creates similar liability for the

> use[] in commerce [of] any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation,

connection, or association of such person with another
person, or as to the origin, sponsorship, or approval
of his or her goods, services, or commercial
activities by another person.

15 U.S.C. § 1125(a)(1).

The Lanham Act defines "use in commerce" of a mark to mean

[the mark] is placed in any manner on the goods or
their containers or the displays associated therewith
or on the tags or labels affixed thereto, or if the
nature of the goods makes such placement
impracticable, then on documents associated with the
goods or their sale.

Id. Thus, "[a] plaintiff is not required to demonstrate that a
defendant made use of the mark in any particular way to satisfy
the 'use in commerce' requirement."  Kelly-Brown v. Winfrey, 717
F.3d 295, 305 (2d Cir. 2013).  For the reasons that follow, Tory
Burch is entitled to summary judgment as to Defendants'
liability for trademark infringement of Tory Burch's TT Logo.[5]

**A.   Entitled to Protection**

A mark's registration with the PTO creates a presumption
that the mark is valid and entitled to protection; a registered
mark becomes "incontestable" after five years of continuous use,
barring many defenses to alleged infringement.  15 U.S.C. §
1115(b); Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S.
205, 209 (2000) (citing 15 U.S.C. §§ 1057(b), 1065).  To be

---

[5] While Tory Burch argues, in its memorandum of law, that
Defendants are liable for counterfeiting the "Tory Burch" word
mark in addition to the TT Logo, Tory Burch limits its
infringement argument to the TT Logo.

entitled to protection, a mark must be "distinctive" rather than "generic," Louboutin, 696 F.3d at 216 (citation omitted), such that the mark is "capable of distinguishing the products it marks from those of others." Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 344 (2d Cir. 1999). A mark is "inherently distinctive if its intrinsic nature serves to identify a particular source." Louboutin, 696 F.3d at 216 (citation omitted).

"[S]tylized shapes or letters may qualify [as inherently distinctive], provided the design is not commonplace but rather unique or unusual in the relevant market." Star Indus., Inc. v. Bacardi & Co. Ltd., 412 F.3d 373, 382 (2d Cir. 2005). "The guiding principle in distinguishing protectable from unprotectable marks is that no one enterprise may be allowed to attain a monopoly on designs that its competitors must be able to use in order to effectively communicate information regarding their products to consumers." Id. In judging inherent distinctiveness, courts classify marks, in ascending order of distinctiveness, as "(1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful." Id. at 384-85 (citation omitted).

If a mark is not inherently distinctive, it may still "acquire distinctiveness by developing secondary meaning in the public mind." Louboutin, 696 F.3d at 216 (citation omitted).

"A mark has acquired secondary meaning when, in the minds of the public, the primary significance of a product feature is to identify the source of the product rather than the product itself." Id. (citation omitted).  "The crucial question in a case involving secondary meaning always is whether the public is moved in any degree to buy an article because of its source." Id. at 226 (citation omitted).  Relevant factors in determining secondary meaning include "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and, (6) length and exclusivity of the mark's use."  Id. (citation omitted).  Although distinctiveness is "an inherently factual inquiry . . . [where] the record contains sufficient undisputed facts to resolve the question of distinctiveness . . . [a court] may do so as a matter of law." Id.

Here, the TT Logo and Bare TT Logo are entitled to a presumption of protection, as they have been registered with the PTO in connection with jewelry.  In addition, the TT Logo Trademark has become incontestable.  And there is insufficient evidence in the record to permit any reasonable fact-finder to rebut this presumption.

Even in the absence of any presumption, the evidence establishes that the TT Logo[6] is entitled to protection, as there can be no dispute that the public is "moved in [some] degree to buy [Tory Burch products bearing the logo] because of [their] source." Id. (citation omitted).  Tory Burch has produced a consumer survey linking its logo to its brand; unsolicited media coverage noting the logo has become an "iconic" identifier of Tory Burch products; substantial sales success since the brand's introduction in 2003; attempts to plagiarize the mark (at issue here); and more than ten years of exclusive use of the mark, apart from purported counterfeiters.  Accordingly, the TT Logo has acquired secondary meaning.[7]

---

[6] Because, as explained below, Tory Burch has established a likelihood of confusion between the Accused Products and the TT Logo, the Court need not separately consider the Bare TT Logo.

[7] Under the "aesthetic functionality doctrine," "where an ornamental feature is claimed as a trademark and trademark protection would significantly hinder competition by limiting the range of adequate alternative designs," no protection will be granted.  Louboutin, 696 F.3d at 222 (citation omitted). "[C]ourts must carefully weigh the competitive benefits of protecting the source-identifying aspects of a mark against the competitive costs of precluding competitors from using the feature." Id. (citation omitted).  Defendants have never alleged or argued that the TT Logo is functional and therefore ineligible for protection.  To the contrary, Defendants' own Trademark Counterclaim alleged a protectable interest in the Isis Cross Design in connection with the Accused Products.  In any case, no reasonable jury could find, on this record, that protecting the TT Logo would "significantly hinder competition by limiting the range of adequate alternative designs" in jewelry.

**B.    Likelihood of Confusion**

Second, Tory Burch must establish "a probability of confusion, not a mere possibility," caused by the Accused Products, "affecting numerous ordinary prudent" persons.  Star, 412 F.3d at 383 (citation omitted).  Confusion giving rise to a claim of trademark infringement includes confusion as to "source, sponsorship, affiliation, connection, or identification." Id. (citation omitted).  A plaintiff may show either "direct confusion" -- "a likelihood that consumers will believe that the [plaintiff] trademark owner sponsors or endorses the use of the challenged mark" -- or "reverse confusion" -- a likelihood that consumers "will believe that the [the owner of the challenged mark] is the source of [plaintiff's own] goods." Kelly-Brown, 717 F.3d at 304 (citation omitted).

This confusion need not occur at the point of sale; the Lanham Act also protects against "initial interest confusion" and "post-sale confusion." Malletier v. Burlington Coat Factory Warehouse Corp., 426 F.3d 532, 539 n.2 (2d Cir. 2005).  Post-sale confusion may occur "when a manufacturer of knockoff goods offers consumers a cheap knockoff copy of the original manufacturer's more expensive product, thus allowing a buyer to acquire the prestige of owning what appears to be the more expensive product." Hermes Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 108 (2d Cir. 2000).  In this context,

29

purchasers of the knockoff may "confus[e] the viewing public and achiev[e] the status of owning the genuine article at a knockoff price."  Id. at 109.

To determine whether there is a likelihood of confusion, courts look to the eight factors set out by Judge Friendly in Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492 (2d Cir. 1961):

> (1)  strength of the trademark;
> (2)  similarity of the marks;
> (3)  proximity of the products and their competitiveness with one another;
> (4)  evidence that the senior user may 'bridge the gap' by developing a product for sale in the market of the alleged infringer's product;
> (5)  evidence of actual consumer confusion;
> (6)  evidence that the imitative mark was adopted in bad faith;
> (7)  respective quality of the products; and
> (8)  sophistication of consumers in the relevant market.

Kelly-Brown, 717 F.3d at 307 (citation omitted).  Courts' application of these factors is not to be "mechanical, but rather, [should] focus[] on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused" in the context (e.g., post-sale) alleged by plaintiff.  Id. (citation omitted); see Burlington, 426 F.3d at 539 n.2.  "Where the predicate facts are beyond dispute, the proper balancing of these factors is considered a question of

law." <u>Playtex Prods., Inc. v. Georgia-Pac. Corp.</u>, 390 F.3d 158, 162 (2d Cir. 2004), <u>abrogated in unrelated part as recognized by Starbucks Corp. v. Wolfe's Borough Coffee, Inc.</u>, 588 F.3d 97, 107 (2d Cir. 2009).

Here, even after finding all disputed facts in Defendants' favor and drawing all reasonable inferences in their favor, the likelihood of confusion is clear.  The <u>Polaroid</u> factors are discussed, in turn, below.

### 1.    Strength of the Mark

The first factor, the strength of the mark, favors Tory Burch.  The strength of the trademark is the mark's "tendency to uniquely identify the source of the product," and a mark is "strong to the extent that the mark is distinctive, either inherently or by virtue of having acquired secondary meaning." <u>Star</u>, 412 F.3d at 384.

As indicated in the above analysis of distinctiveness, the TT Logo is a strong mark.  The TT Logo is, itself, a very distinctive design.  It is composed of an extremely stylized letter "T," flipped and set atop an identical letter "T."  And as explained above, the factors relevant to a finding of secondary meaning clearly establish such meaning here.  Indeed, in the last two years, <u>Forbes</u> has referred to the TT Logo as "iconic" and "distinctive" and the <u>Wall Street Journal</u> has noted the TT Logo is "as instantly recognized as those of brands

established generations prior." Defendants' own Trademark Counterclaim alleges that the TT Logo is so distinctive as an identifier of Tory Burch products that "customers, the public and the trade [are likely to] believ[e] that Lin & J has infringed on . . . Tory Burch's trademark." The TT Logo is a paradigmatic example of a design with strong secondary meaning. Accordingly, the TT Logo is a strong mark and this factor favors Tory Burch.

### 2.   Similarity of the Marks

The second factor, similarity of the marks, strongly favors Tory Burch. "[T]he law requires only confusing similarity, not identity." Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 117 (2d Cir. 2006). While side-by-side comparison of the marks "may be a useful heuristic means of identifying the similarities and differences between two products," courts are to "focus on actual market conditions and the type of confusion alleged." Burlington, 426 F.3d at 534. Where, as here, plaintiff claims post-sale confusion, "market conditions must be examined closely to see whether the differences between the marks are likely to be memorable enough to dispel confusion on serial viewing." Dooney, 454 F.3d at 117 (citation omitted). Courts are to look to "the mark's overall impression on a consumer, considering the context in which the marks are displayed and the totality of factors that could cause confusion

among prospective purchasers." <u>Burlington</u>, 426 F.3d at 537

(citation omitted).

Here, Defendants' Predecessor Design and Isis Cross Design

are quite similar to the TT Logo.  As seen below, all three

create the impression of a cross, with an internal division and

certain stylistic embellishments along the stems and at the

points.



From left to right: Tory Burch's TT Logo, Lin & J's
Predecessor Design, and Lin & J's Isis Cross.

Especially in the post-sale context, where many members of the

public will not be able to compare the Accused Products to

genuine Tory Burch products, or even to do more than glance at

the Accused Products, these three designs give the same overall

impression and are quite likely to cause confusion as to the

source of the Accused Products.  The vertical internal division

present in the Lin & J designs but not the TT Logo is also

unlikely "to be memorable enough to dispel confusion on serial

viewing," given that by 2009 -- more than two years before Lin &

J's unchanged invoices show use of either of its designs -- Tory

Burch was using the Split TT Logo (the TT Logo with a vertical

internal division as well as horizontal one) on jewelry.
Accordingly, the many members of the public familiar with the
Tory Burch brand are less likely to make particular note of the
vertical internal division, since that is also associated with
the Tory Burch brand.  And although a close side-by-side
comparison reveals that the Isis Cross Design's embellishments
include curls, that design retains the Predecessor Design's --
and the TT Logo's -- short barbs along the stem of the "T."
Again, the overall impression is one of striking similarity
likely to cause confusion in the post-sale context.

Moreover, it is important to note that the Accused Products
resemble Tory Burch jewelry not just in these designs, but also
in other features of the product.  As noted above, certain
jewelry among the Accused Products are otherwise designed to
closely resemble genuine Tory Burch products.  This increases
the likelihood of confusion in the post-sale context, as the
similarity among the TT Logo and Predecessor Design or Isis
Cross Design is reinforced by similarities throughout the rest
of the jewelry.

Tory Burch's survey confirms this, finding that a similar
proportion of respondents identified Tory Burch as the source of
both Tory Burch products and the Accused Products: 26% of
respondents identified Tory Burch as the source of Tory Burch
products, compared to 31% who identified Tory Burch as the

source of Accused Products with the Isis Cross Design and 25% of
respondents who did the same for Accused Products bearing the
Predecessor Design.

### 3.    Proximity of the Products

The third factor, the proximity of the products and their
competitiveness with one another, also favors Tory Burch.[8]  Tory
Burch's products, like the Accused Products, are relatively
affordable fashion jewelry.  While the Accused Products often
retail for less than Tory Burch products, sometimes they retail
for similar prices.  In some stores, the Accused Products were
sold alongside Tory Burch products.  As explained above, members
of the public are quite likely to mistake the Accused Products
for genuine Tory Burch products.  This creates an incentive for
purchasers of the Accused Products to "confus[e] the viewing
public and achiev[e] the status of owning the genuine [Tory
Burch] article at a [somewhat lower] price."  Hermes, 219 F.3d
at 109.  And Tory Burch has produced an expert report showing
substantial lost profits as a result of Defendants' sales of the
Accused Products.  On this record, any reasonable jury would
find that these products directly compete with one another.

---

[8] Tory Burch argues that this factor is irrelevant in the post-
sale context, but does not explain why competitive proximity
would not increase the likelihood of confusion.  If the TT Logo
and the Isis Cross Design or Predecessor Design were affixed to
very different products, the likelihood of confusion would be
diminished.

### 4.   "Bridge the Gap"

The fourth factor, whether the senior user will
"bridge the gap" by inserting a product into the alleged
infringer's market, is "irrelevant" here, because the
products "are already in competitive proximity" and thus
"there is really no gap to bridge."  Star, 412 F.3d at 387.

### 5.   Evidence of Actual Consumer Confusion

The fifth factor, actual consumer confusion, strongly
favors Tory Burch.  Tory Burch's survey shows that a similar
proportion of respondents identified Tory Burch as the source of
both Tory Burch products and the Accused Products.  In fact, a
greater proportion of respondents erroneously identified the
Accused Products bearing the Isis Cross Design as Tory Burch
products (31%) than identified actual Tory Burch products as
genuine (26%).  The record includes no other survey.  In
addition, U.S. Customs agents, as well as New York City Peddler
Task Force officers, seized some of the Accused Products
believing them to be counterfeits of Tory Burch products.
Accordingly, this factor strongly favors Tory Burch.

### 6.   Bad Faith

The sixth factor, evidence that the imitative mark was
adopted in bad faith, strongly favors Tory Burch as well.
"Bad faith generally refers to an attempt by a junior user
of a mark to exploit the good will and reputation of a

senior user by adopting the mark with the intent to sow confusion between the two companies' products." <u>Star</u>, 412 F.3d at 388.  Such was the case here.

Here, the only reliable invoices produced by Defendants show that the Accused Products were first sold on December 22, 2011, while Tory Burch products were first sold in 2004 and became extremely popular in the following years.  <u>Cf.</u> <u>Star</u>, 412 F.3d at 389 ("Bad faith may be inferred from the junior user's actual or constructive knowledge of the senior user's mark.")  In an attempt to show that the Isis Cross Design had been used as a trademark prior to late 2011, Defendants fabricated the False Collection Books for the years 2009, 2010, 2011, and 2012 in August 2013.  They presented the 2009 False Collection Book to the PTO, and each of the False Collection Books to Tory Burch in this action.  Defendants also substantively altered invoices produced to Tory Burch to backdate their use of the Predecessor Design and Isis Cross Design.

In addition to Defendants' spoliation and fabrication of evidence to support Defendants' Trademark Counterclaim alleging that the Predecessor Design and Isis Cross Design were original -- which Defendants chose to voluntarily dismiss after Tory Burch filed its motion for sanctions --

37

Defendants marketed the Accused Products as Tory Burch
knockoffs.  Defendants themselves used the phrase "Tory
Burch Style" to refer to one of the Accused Products in
invoices to retailers; hundreds of these retailers then
marketed the Accused Products with reference to "Tory
Burch," "Tory," or "T.B."  When Defendants learned that
their customer Sam Mi had been contacted by Tory Burch,
they did not contend that the Predecessor Design or Isis
Cross Design did not infringe Tory Burch's intellectual
property rights -- instead, Defendants falsified invoices
for Sam Mi to hide the extent of Sam Mi's sale of Accused
Products bearing the Isis Cross Design.  The evidence of
Defendants' bad faith is overwhelming, and is not rebutted
by other record evidence.  Accordingly, this factor
strongly favors Tory Burch.

### 7.   Quality of the Products

The seventh factor, the respective quality of the products,
is neutral.  According to Defendants' expert, Keegan, the
Accused Products are inferior to genuine Tory Burch products;
Tory Burch disputes this, noting that Defendants have
represented that the Accused Products are "high quality."
Should a jury find the quality inferior, this may "tarnish[]
[Tory Burch]'s reputation if consumers confuse the two."
Morningside Grp. Ltd. v. Morningside Capital Grp., LLC, 182 F.3d

133, 142 (2d Cir. 1999).  In the post-sale context, where many members of the general public will not be able to touch and closely examine the Accused Products, it appears unlikely that the persons confused would register any inferior quality.  To the extent they did, this would also decrease the likelihood of confusion, to the extent they also knew genuine Tory Burch products were of higher quality.  Should a jury find the quality similar, this would slightly increase the likelihood of confusion, but remove the threat that Tory Burch's brand would be tarnished by inferior quality.  Either way, this factor has a very limited impact on the likelihood of confusion.

### 8.   Sophistication of Consumers

The final factor, sophistication of consumers, somewhat favors Defendants.  An analysis of consumer sophistication "considers the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods."  Star, 412 F.3d at 390 (citation omitted).  Where, as here, a plaintiff alleges post-sale confusion, the sophistication of the general public taking note of these products should be considered.  There is limited evidence in the record about the sophistication of members of the public likely to take note of those products.  The Tory Burch Survey indicates that between one-fourth and one-third of women between the ages

of 21 and 59 who read at least one fashion magazine or fashion
blog on a "regular basis" recognized the Tory Burch brand.  This
suggests that those in the public who might be confused about
the source of the Accused Products are somewhat sophisticated,
as they are more knowledgeable about fashion than between three-
quarters and two-thirds of woman who read a fashion publication
regularly.

Yet here, that same survey shows that nearly all of those
women who might confuse the Accused Products for Tory Burch
products would, in fact, do so, given that respondents who said
they had "heard of Tory Burch" identified the Accused Products
and authentic Tory Burch jewelry as Tory Burch products at
approximately the same rate: 57% for Tory Burch products; 53%
for the Isis Cross Design; and 51% for the Predecessor Design.
"[W]hen, as here, there is a high degree of similarity between
the parties' [products] and marks, the sophistication of the
buyers cannot be relied on to prevent confusion." Morningside,
182 F.3d at 143 (citation omitted).  This is especially true
where plaintiff has "presented evidence of actual confusion"
among the target consumers.  Id.  Here, sophistication did not
reduce the likelihood of confusion.  Accordingly, sophistication
of consumers favors Defendants only very slightly or is neutral.

Of the eight Polaroid factors, five favor Tory Burch, one
may very slightly favor Defendants, one is neutral, and one is

irrelevant.  Of the five that favor Tory Burch, three of the
most important factors -- the similarity of the marks, actual
consumer confusion, and bad faith -- each strongly favored Tory
Burch.  See Burlington, 426 F.3d at 537 ("Of salient importance
among the Polaroid factors is the 'similarity of the marks'
test."); Savin Corp. v. Savin Grp., 391 F.3d 439, 459 (2d Cir.
2004) ("There can be no more positive or substantial proof of
the likelihood of confusion than proof of actual confusion.")
(citation omitted).  Defendants themselves alleged a likelihood
of confusion in their Trademark Counterclaim, and Kim maintained
at her deposition that confusion was likely.  It is clear, as a
matter of law, that a substantial likelihood of confusion exists
here.  Accordingly, Tory Burch is entitled to summary judgment
with respect to each of the Lin & J entities' liability on Tory
Burch's trademark infringement claim.

**III. Counterfeiting Claim**

    **A.   TT Logo**

    Tory Burch also alleges that Defendants have engaged in
trademark counterfeiting in violation of Section 32 of the
Lanham Act, 15 U.S.C. § 1114.  The Lanham Act defines
"counterfeit" as "a spurious mark which is identical with, or
substantially indistinguishable from, a registered mark."  15
U.S.C. § 1127.  The TT Logo is registered via the TT Logo
Trademark.  To determine whether the accused mark is

41

"substantially indistinguishable from" the registered mark,
courts are to consider consumers' experience with the marks.
See Kelly-Brown, 717 F.3d at 314-15.  Even from the perspective
of a potential purchaser, the Predecessor Design and Isis Cross
Design are "substantially indistinguishable" from the TT Logo.
As noted above, even a side-by-side comparison reveals few
differences.  The largest difference is that Defendants' marks
include a vertical division where the TT Logo as registered does
not; but, pre-dating those marks, Tory Burch used a variation of
the registered TT Logo, the Split TT Logo, in certain jewelry,
and this variation included the same vertical division.  Cf.
Montres Rolex, S.A. v. Snyder, 718 F.2d 524, 532 (2d Cir. 1983)
(holding, in the context of federal law prohibiting the
importation of counterfeit goods as defined by the Lanham Act,
that a mark is a "counterfeit" if it mimics the registered mark
as it appears on actual merchandise, rather than as it appears
on the registration certificate, noting that "counterfeiters
copy actual merchandise, not registration certificates").  The
Tory Burch Survey confirms that consumers found Lin & J's
designs to be "substantially indistinguishable" from the TT
Logo, as they identified the Accused Products as genuine Tory
Burch products at approximately the same rate they correctly
identified authentic Tory Burch jewelry.  Likewise, the U.S.
Customs agents and New York City Police Department Peddler Task

Force officers seized some of the Accused Products, unprompted, believing them to be Tory Burch counterfeits.

Moreover, the record evidence demands of any reasonable fact-finder the inference that Defendants were intentionally counterfeiting Tory Burch products.  Defendants sold at least one of the Accused Products as "Tory Burch Style," and hundreds of Defendants' retailers marketed the Accused Products as "Tory Burch" products.  Defendants subsequently falsified invoices and fabricated evidence of prior use of these marks.  As noted above, many of the Accused Products appear nearly identical to genuine Tory Burch products in all respects -- not just the challenged marks.  Defendants' clear intent to create counterfeit Tory Burch products confirms the conclusion that Lin & J's marks are "substantially indistinguishable" from the TT Logo.

Counterfeit marks are inherently confusing, and thus it is not clear that a distinct likelihood-of-confusion analysis is required for a counterfeit claim.  See, e.g., Coach, Inc. v. Zhen Zhen Weng, 13cv445, 2014 WL 2604032, at *13 (S.D.N.Y. June 9, 2014).  Regardless, as the same Accused Products are at issue in both the trademark infringement and counterfeiting claims, the analysis above has equal force with respect to the counterfeiting claim.  Accordingly, Tory Burch is entitled to

summary judgment as to each Lin & J entities' liability for counterfeiting the TT Logo.

### B.   "Tory Burch" Word Mark

Tory Burch also alleges that Defendants are liable under Section 32 of the Lanham Act for counterfeiting the "Tory Burch" word mark.  The only evidence Tory Burch cites is Defendants' description of one of the Accused Products as "Tory Burch Style Stretch Ring" in invoices to customers.  This description is not "identical with, or substantially indistinguishable from," the "Tory Burch" word mark used to brand authentic Tory Burch jewelry.  It does not indicate that the ring is a genuine Tory Burch ring; rather, it plainly suggests it is a knockoff, made to look similar to an authentic Tory Burch ring.  Accordingly, Tory Burch is not entitled to summary judgment on its claim for counterfeiting the "Tory Burch" word mark.

### IV.  Defendant Kim's Personal Liability

"To be liable for contributory trademark infringement, a defendant must have (1) intentionally induced the primary infringer to infringe, or (2) continued to supply an infringing product to an infringer with knowledge that the infringer is mislabeling the particular product supplied."  Kelly-Brown, 717 F.3d at 314 (citation omitted).  These principles apply in the same manner to trademark counterfeiting.  Here, Kim authorized, directed, and was the moving force behind the design,

manufacture, marketing, and sale of the Accused Products. Accordingly, under the first prong of this test, Tory Burch is also entitled to summary judgment with respect to Kim's liability for trademark infringement and counterfeiting the TT Logo.

## CONCLUSION

Tory Burch's September 10, 2014 motion for summary judgment as to Defendants' liability for trademark infringement and counterfeiting is granted, except as to liability for counterfeiting the "Tory Burch" word mark.


SO ORDERED:

Dated:     New York, New York
           December 4, 2014

                                    _____
                                    DENISE COTE
                        United States District Judge