UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- X
RIVER LIGHT V, L.P. and TORY BURCH    :
LLC,                                  :
                                      :
                 Plaintiffs,          :
                                      :        13cv3669 (DLC)
        -v-                           :
                                      :        OPINION & ORDER
LIN & J INTERNATIONAL, INC., YOUNGRAN :
KIM, LJ BRAND, INC., and NJ LIN & J   :
INTERNATIONAL, INC.,                  :
                                      :
                 Defendants.          :
------------------------------------- X

APPEARANCES:

For Plaintiffs River Light V, L.P. and Tory Burch LLC:

Natalie L. Arbaugh
Michael A. Bittner
FISH & RICHARDSON PC
1717 Main St., Ste. 5000
Dallas, TX 75201

Irene E. Hudson
FISH & RICHARDSON PC
601 Lexington Ave., 52nd Fl.
New York, NY 10022

For Defendants Lin & J International, Inc., Youngran Kim, LJ
Brand, Inc., and NJ Lin & J International, Inc.:

Howard Z. Myerowitz
SONG LAW FIRM LLC
400 Kelby St., 7th Fl.
Fort Lee, NH 07024

DENISE COTE, District Judge:

     On December 4, 2014, defendants Youngran Kim ("Kim") and

three companies she controls, Lin & J International, Inc., LJ

Brand, Inc., and NJ Lin & J International, Inc. (together, "Lin

& J," and with Kim, "Defendants"), were found liable for trademark infringement under the Lanham Act.  Plaintiffs River Light V, L.P. and Tory Burch LLC (together, "Tory Burch" or "Plaintiffs") have moved for attorneys' fees and costs as sanction for Defendants' misconduct ("Fees Motion"), and now move for damages, injunctive relief, additional attorneys' fees and costs, and other remedies ("Damages Motion").  In addition, they have moved to strike certain documents that Defendants have submitted in connection with their opposition to the Damages Motion, as well to exclude the report of Defendants' expert, Warren Keegan ("Keegan").  For the reasons that follow, Tory Burch's motion to strike, motion to exclude, motion for attorneys' fees and costs, and motion for relief under the Lanham Act are granted.

## BACKGROUND

The facts of this case are set out at length in this Court's December 4, 2014 Opinion granting in part Plaintiffs' motion for summary judgment, River Light V, L.P. v. Lin & J Int'l, Inc., No. 13cv3669 (DLC), 2014 WL 6850966 (S.D.N.Y. Dec. 4, 2014) ("Liability Opinion"), familiarity with which is assumed.  Here, a summary of the most germane facts will suffice.

Tory Burch is a popular and well-known fashion brand.  It
operates 120 stores of its own worldwide; its fashion line is
sold at over 3,000 others.  Tory Burch's logo, featured
prominently on most of its products, is a distinctive and widely
recognized design consisting of two "Ts" superimposed to create
a cross-like figure.  Tory Burch has used this "TT Logo"
continuously since 2004, and owns several trademarks on various
permutations and uses of that logo, the first of which was
granted in 2005.

Defendant Kim is the founder of the three co-defendant
corporations.  Lin & J manufactured and sold to wholesalers
numerous products bearing TT-logo-like designs, including
products that closely resembled Tory Burch merchandise both in
logo and design.  Noting increasing market prevalence of knock-
off products and concerned about widespread infringement of its
trademarks, Tory Burch began sending cease-and-desist letters to
some of Defendants' clients in late 2012.

Upon learning of the letters, Kim began applying for two
trademarks, one of which claimed a so-called "Isis Cross" design
that she purported to have used since 2003.  The "Isis Cross"
was the same logo already featured on many of Lin & J's
products, and bears strong resemblance to Tory Burch's
trademarked "Split TT" Logo.  Kim's trademark application was

rejected in May 2013, although Defendants persisted in attempting to obtain one through the next year.

On May 31, 2013, Tory Burch filed this suit alleging, inter alia, trademark counterfeiting pursuant to Section 32(1)(a) of the Lanham Act, 15 U.S.C. § 1114(a)(1), and trademark infringement pursuant to Section 43(a)(1) of the Lanham Act, id. § 1125(a)(1).  On July 18, 2013, Defendants filed an answer denying the allegations, asserting numerous affirmative defenses, and counterclaiming, among other things, that Tory Burch was infringing Kim's trademark.

It was at this point that Kim also began or directed to begin an extensive and flagrant fraud that lasted over a year. A detailed timeline is available in the Liability Opinion, 2014 WL 6850966 at *5-7.  The evidence demonstrates that Defendants engaged in fraud and spoliation by fabricating and altering documents, as well as repeated instances of perjury and other dishonest conduct.  Defendants also filed spurious counterclaims -- for tortious interference with business relations, defamation, and (ironically) abuse of process -- and even sought a temporary restraining order on the basis of their fabrications.  Their conduct substantially delayed this litigation, driving up discovery costs and clogging the docket with unnecessary applications and motion practice.

Plaintiffs moved for sanctions on the basis of Defendants' misconduct on August 29, 2014, and moved for summary judgment on the issue of liability on September 10, 2014.  Defendants' opposition to that motion was due October 2; it was filed untimely.  Defense counsel, however, falsely represented otherwise.  A hearing on Plaintiffs' motion for sanctions and counsel's misrepresentations was held on November 4-5, and Defendants' sanctions motion was granted on November 12.  The sanction imposed was severe: Because Defendants were unable to submit an opposition to summary judgment that did not rely upon fraudulent or tainted evidence, their opposition papers were stricken.

On December 4, 2014, the Court granted Plaintiffs' motion for summary judgment on the issue of liability, holding that Defendants were liable for trademark infringement and counterfeiting of Tory Burch's logo.  Id. at *15-17.  In so doing, the Court found that Defendants' conduct was willful and intentional.[1]

---

[1] On June 11, Plaintiffs provided evidence that Defendants have continued to sell their infringing merchandise well after the Liability Opinion was issued on December 4.  As of mid-June 2015, their websites continued to feature prominently the infringing products and offer them for sale, and the products were sold directly -- in bulk quantities, i.e. for resale, only -- at Lin & J's showroom in Manhattan.  On at least one occasion, the showroom sales took place with the personal approval of Kim.  Defendants have not responded to Plaintiffs' June 11 letter or disputed its assertions.

On January 20, 2015, the parties notified the Court that they had reached an agreement to forgo a jury trial and evidentiary hearing on the issues of damages and injunctive relief, and requested that those issues instead be resolved by motion practice on the basis of evidence already in the record and any additional evidence they regarded as relevant.  The Court endorsed this agreement, and Plaintiffs moved for various remedies under the Lanham Act on March 3, 2015.  Defendants submitted their opposition memorandum on March 23 -- which indicated no opposition to Plaintiffs' proposed injunctive relief -- and the motion was fully submitted on March 27.  There being no opposition, on June 11, 2015, the Court entered a Partial Judgment granting Plaintiffs' motion for permanent injunctive relief.

Three additional motions are at issue here; all ultimately bear on the issue of determining the appropriate amount of damages.  Defendants relied upon Keegan's report to rebut the expert report of Plaintiffs' damages expert, Dr. Russell Mangum.  On October 15, Tory Burch moved to strike Keegan's report and to exclude his proposed testimony, and the motion was fully submitted on January 5, 2015.

On November 21, 2014, Plaintiffs formally moved for attorneys' fees and costs related to Defendants' misconduct, as established at the sanctions hearing.  Defendants opposed the

motion on December 10, and it was fully submitted on December 19.  Plaintiffs' original submission, however, included documentation inadequate to properly assess their request, and on January 16, 2015 Plaintiffs were ordered to provide detailed summaries of fees relating to a number of specific topics and attorneys.  Defendants submitted an opposition to Plaintiffs' supplemental submission on February 20, and Plaintiffs submitted a reply on February 26.

Finally, on March 30, Plaintiffs moved to strike the evidence Defendants submitted with, and rely upon in, their March 23 memorandum in opposition to the Damages Motion, on the grounds that the evidence is fraudulent and unreliable. Defendants submitted their opposition on April 13, and the motion was fully submitted on April 20.  Each motion is discussed below in turn.

## DISCUSSION

I. Plaintiffs' Motion to Strike Certain Evidence

Plaintiffs have moved to strike certain evidence upon which Defendants' memorandum in opposition to Plaintiffs' March 3 motion relies.  Specifically, they seek to strike Kim's declaration and three of its exhibits: invoices from Belco purporting to show the existence of Defendants' design in 2003; invoices for Lin & J's sales from 2008, produced by a third party; and the U.S. Patent & Trademark Office (PTO)'s "Office

Action" regarding Defendants' failed attempt to trademark their version of the Tory Burch design.  The basis for Plaintiffs' motion is straightforward: the Court previously found identical or substantially similar evidence to be either fraudulent or tainted by fraud such that it was irretrievably unreliable.  As explained at that time, "none of the documents that [were] produced by the defendants in discovery can be relied upon," and many of Defendants' affirmative defenses and counterclaims, as well as summary judgment opposition papers that relied upon this evidence, were accordingly stricken.

The unreliability of this evidence is manifest.  Kim has repeatedly perjured herself -- not only before the Court in this action, but in depositions and before the PTO.  She has also personally fabricated and altered documents.  Her declaration, which repeats much of the information she has previously supplied to the Court, is not credible.[2]  For their part, the Belco documents and the third-party invoices have been found fraudulent or tainted by fraud, and Defendants' continued reliance on both was cited as grounds for striking their opposition papers.  Indeed, in that Order, the Court

---

[2] Even if, as Defendants baldly argue, her declaration here "stands alone from [her] previous testimony," Kim relies in it upon the other three categories of evidence at issue, all of which are unreliable.

specifically rejected the very argument -- that third-party copies of the selfsame invoices are reliable -- that Defendants advance here.  Finally, the PTO documents were generated in the course of Defendants' campaign to fraudulently obtain a trademark, in response to fabricated and misrepresented submissions.  Defendants have made no attempt to rehabilitate this evidence beyond asserting that it differs in immaterial or unspecified ways from evidence previously found unreliable.  This is not enough to salvage it.

Under the spoliation doctrine, the fraud on the court doctrine, Federal Rule of Civil Procedure 11 ("Rule 11"), and pursuant to its inherent powers, a court has broad authority and discretion to sanction parties' and attorneys' misconduct.  See, e.g., Mitchell v. Lyons Prof'l Servs., Inc., 708 F.3d 463, 469 (2d Cir. 2013); West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999); Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1117 (1st Cir. 1989).  And in its November 5, 2014 findings of fact and subsequent Order of November 12, the Court invoked this authority to strike certain of Defendants' defenses and counterclaims as well as their summary judgment opposition papers, which relied upon the fabricated or tainted evidence here.  The effect of the previous sanction was implicitly to exclude the fabricated or tainted evidence itself from the record.  Because the evidence on which Defendants rely here is

either identical or substantially similar, and because it remains unreliable, the evidence is stricken again.

II. Plaintiffs' Motion to Exclude Keegan's Expert Report

Defendants rely upon Keegan's report -- which ostensibly offers opinions on the amount of damages appropriate to award under the Lanham Act here -- to rebut the report of Plaintiffs' damages expert.  Plaintiffs move to strike Keegan's report pursuant to Federal Rule of Evidence 702, which governs the admissibility of expert testimony.  Rule 702 requires that (1) such "testimony is based on sufficient facts or data," (2) "the testimony is the product of reliable principles and methods," and (3) "the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702; Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592 (1993).  "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony."  Ruggiero v. Warner-Lambert Co., 424 F.3d 249, 255 (2d Cir. 2005).  An expert must also "assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  "This condition goes primarily to relevance," because "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  Daubert, 509 U.S. at 591 (citation omitted); see id. at 587

(quoting Fed. R. Evid. 402) ("Relevant evidence is defined as that which has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probably or less probable than it would be without the evidence.'").

Under the Lanham Act, a plaintiff is entitled "to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. § 1117(a).  In brief, Keegan's report argues that Plaintiffs' disgorgement calculations significantly overstate Defendants' profits and that calculations of Plaintiffs' lost profits are premised on the flawed assumption that Tory Burch's and Defendants' products have "comparable market[s] and customer[s]."  These opinions do not satisfy the threshold requirements of reliability and relevance.  First, he is unable to provide an opinion on the proper amount of Defendants' profits because he was not "asked to calculate the Lin & J lost profit on the accused sales," and thus did not examine Lin & J's financial records.  In other words, he cannot provide any reliable calculations of damages that Defendants believe are due to Plaintiffs because his data is not just inadequate -- it is nonexistent.[3]

---

[3] Moreover, Keegan fundamentally misunderstands the law governing damages calculations: He critiques Mangum's report because it

Second, Keegan attempts to rebut Plaintiffs' calculations of damages by arguing that there is no "comparable market and customer for the Lin & J and Tory Burch products."  To that end, Keegan argues that the "Lin & J accused products and alleged comparable Tory Burch products are not competitors in the marketplace, are clearly distinguished by consumers, and do not compete with each other," and thus that no damages are warranted at all.  But the similarity of the products, whether consumers clearly distinguish between them, and whether they compete with one another are issues relevant to Defendants' liability, not the appropriate measure of damages.  See Liability Opinion, 2014 WL 6850966 at *9-15.  All three issues were settled by the Liability Opinion.  See id.  Keegan's opinions are therefore neither reliable nor relevant to any fact in dispute, and his report is accordingly stricken.  See Fed R. Evid. 702(a); id. 402.

III. Plaintiffs' Motion for Remedies Under the Lanham Act

Plaintiffs move for a suite of remedies under the Lanham Act.  First, they request disgorgement of Defendants' profits,

---

states "that 'it is the defendants' burden to identify relevant costs and deductions to this revenue and to identify any apportionment of resulting profits to factors other than the misappropriated intellectual property violation.'"  Moreover, in his deposition, he explicitly "disagree[d] with the assertion that it is the defendants' burden to identify apportionment of profits" under the Lanham Act.

compensation for their own lost profits, or statutory damages
under 15 U.S.C. §§ 1117(a) and (c).  They also move that any
recovery of profits or damages be trebled pursuant to 15 U.S.C.
§ 1117(b) because Plaintiffs' infringement was "intentional,"
and seek pre- and postjudgment interest on any award.  Second,
they seek attorneys' fees and costs pursuant to the Lanham Act.[4]
Finally, they seek injunctive relief pursuant to 15 U.S.C.
1116(a): a permanent injunction barring further infringement by
the Defendants and an injunction requiring Defendants to
withdraw their trademark application.  Defendants do not object
to the entry of this injunctive relief, and a partial judgment
issued on June 11, 2015 granting Plaintiffs' motion to that
extent.  A general description of the law governing Lanham Act
remedies is described below; the applicable law is then
discussed in more detail.

   A. Lanham Act Remedies

   The Lanham Act provides plaintiffs remedies both legal and
equitable in cases of trademark infringement.  As to the first
kind, once liability is established under 15 U.S.C. § 1114, and
"subject to the principles of equity," a plaintiff is entitled

---

[4] Plaintiffs' previous motion for fees and costs was premised on
the Court's authority to sanction misconduct.  In this motion,
their request is grounded in the language of the Lanham Act.
Both motions and their respective grounds are addressed below.

"to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. § 1117(a).

The Second Circuit recognizes three theories under which a court may order disgorgement of defendant's profits: unjust enrichment, compensation, and deterrence.  Merck Eprova AG v. Gnosis S.p.A., 760 F.3d 247, 262 (2d Cir. 2014).  "Under any theory, a finding of defendant's willful deceptiveness is a prerequisite for awarding profits."  Id. at 261 (citation omitted).  An award of disgorgement, "premised upon a theory of unjust enrichment, [also] requires a showing of actual consumer confusion -- or at least proof of deceptive intent so as to raise the rebuttable presumption of consumer confusion."  Id. (citation omitted).  "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."  15 U.S.C. § 1117(a).  In its discretion, however, a court may "enter judgment for such sum as the court shall find to be just, according to the circumstances of the case," in the event the amount is deemed "inadequate or excessive."  Id.

In addition to a disgorgement of a defendant's profits, plaintiffs may also recover damages in the form of their own lost profits.  As with disgorgement, "in order for a Lanham Act plaintiff to receive an award of damages[,] the plaintiff must

prove" actual consumer confusion, actual consumer deception, or intentionally deceptive actions.  Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co., 145 F.3d 481, 493 (2d Cir. 1998) (citation omitted).  "Lost profits are calculated by estimating revenue lost due to the infringing conduct and subtracting what it would have cost to generate that revenue." GTFM, Inc. v. Solid Clothing, Inc., 215 F. Supp. 2d 273, 305 (S.D.N.Y. 2002) (Cote, J.).  Although "the quantum of damages . . . must be demonstrated with specificity," the inherent difficulty of estimating the volume of lost sales means "courts may engage in some degree of speculation in computing the amount of damages."  PPX Enters., Inc. v. Audiofidelity Enters., Inc., 818 F.2d 266, 271 (2d Cir. 1987) (emphasis omitted), abrogated on other grounds as recognized in Hannex Corp. v. GMI, Inc., 140 F.3d 194, 206 n. 9 (2d Cir. 1998).  In addition, a court "may award reasonable attorney fees to the prevailing party," 15 U.S.C. § 1117(a), where there is "evidence of fraud or bad faith."  Louis Vuitton Malletier S.A. v. LY USA, Inc., 676 F.3d 83, 111 (2d Cir. 2012) (citation omitted).

The Lanham Act also provides for penalty enhancement. "[U]nless the court finds extenuating circumstances," courts must award treble damages on the greater of either defendant's profits or plaintiff's damages "if the violation consists of . . . intentionally using a mark or designation, knowing such mark

or designation is a counterfeit mark." 15 U.S.C. § 1117(b). In such cases, a court may award attorneys' fees as well. Id. Finally, where a defendant's infringement is found to be willful, plaintiffs may elect to receive statutory damages of up to $2 million per infringing mark per type of goods sold. Id. § 1117(c); see Louis Vuitton, 676 F.3d at 105. "[A]n award of attorney's fees is available under section 1117(a) in 'exceptional' cases even for those plaintiffs who opt to receive statutory damages under section 1117(c)." Louis Vuitton, 676 F.3d at 111.

In addition, courts "have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark" or to prevent further violation of the Lanham Act by the defendant. 15 U.S.C. § 1116(a). In order to obtain a permanent injunction under the Lanham Act, a plaintiff must demonstrate "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006) (Copyright Act); Salinger v. Colting, 607

F.3d 68, 78 (2d Cir. 2010) (noting eBay four-factor test is "the presumptive standard for injunctions in any context").

B. Monetary Damages

Defendants have requested that the Court determine the amount of damages they are eligible to receive under 15 U.S.C. § 1117(a), including Defendants' profits, Plaintiffs' lost profits, and statutory damages.  Each is addressed in turn.

1. Disgorgement

In the Second Circuit, plaintiffs must prove that an infringer acted with "willful deception" or "bad faith" before the infringer's profits are recoverable under 15 U.S.C. § 1117(a).  Int'l Star Class Yacht Racing Assoc. v. Tommy Hilfiger, U.S.A., Inc., 80 F.3d 749, 753 (2d Cir. 1996); George Basch Co. v. Blue Coral, Inc., 968 F.2d 1532, 1540 (2d Cir. 1992).[5]  Although the Second Circuit has not explicated the definition of "willful" in the trademark context, proving "willfulness" under copyright law requires "(1) that the

---

[5] In 1999, Congress amended § 1117(a) to specify that "willful violation" is required to prove certain offenses not at issue here, but left the remainder of the statute intact.  It is "presumed that Congress's inclusion, without alteration, of the [§ 1117(a)] language concerning Section 1125(a) incorporates the existing judicial interpretation of that language," Mastercard Int'l Inc. v. First Nat. Bank of Omaha, Inc., No. 02cv3691 (DLC), 2004 WL 326708, at *11 (S.D.N.Y. Feb. 23, 2004).  In any event, willfulness and bad faith have been clearly established here.

defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's rights," Island Software & Computer Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 263 (2d Cir. 2005).  "Bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products."  Star Indus., Inc. v. Bacardi & Co., 412 F.3d 373, 388 (2d Cir. 2005).

Proof abounds here of Defendants' intent to "sow confusion" -- as explained in the Liability Opinion, "evidence of Defendants' bad faith is overwhelming," and "the record evidence demands of any reasonable fact-finder the inference that Defendants were intentionally counterfeiting Tory Burch products."  2014 WL 6850966, at *14, *16.  To name but a few examples: Defendants referred to their infringing products as "T.B." or "Tory Burch style" in their sales records; Defendants claimed to a wholesale customer that they had Tory Burch's permission to sell their products; Defendants engaged in an elaborate and complex campaign of lies and fabrications to mislead the Plaintiffs, the PTO, and the Court; and well after the Liability Opinion issued Defendants were continuing to offer and sell their infringing products in bulk quantities.

Plaintiffs are plainly entitled to disgorgement of Defendants' profits; the only question is the amount.

Here, the disgorgement calculation is straightforward. Plaintiffs' expert is uncontradicted in his calculation, from Defendants' own records, that Defendants' gross sales are $5,054,805. Defendants have failed to carry their burden of establishing any costs to be deducted from their gross sales. See 15 U.S.C. § 1117(a). While Defendants introduce tax returns from 2011 to the present as evidence of deductible costs, the tax returns necessarily reflect aggregate costs borne by Lin & J, not costs associated with the manufacture, marketing, and sale of the counterfeit goods. Reducing gross sales of the products at issue by total costs of a business is illogical, and Plaintiffs suggest no method of determining the specific costs associated with the infringing products. Accordingly, no reduction on this score will be made.

Defendants also seek additional deductions for certain categories of expenses, ranging from advertising and travel to "meals and entertainment." "Every infringer shoulders the burden of demonstrating a sufficient nexus between each expense claimed and the sales of the unlawful goods," and likewise "has the burden of offering a fair and acceptable formula for allocating a given portion of overhead to the particular infringing items in issue." Hamil Am. Inc. v. GFI, 193 F.3d 92,

105, 107 (2d Cir. 1999) (citation omitted) (Copyright Act).

Defendants have made only a cursory -- and wholly

unsubstantiated -- attempt to connect the deductions sought to

the specific infringing activity.  Accordingly, Tory Burch is

entitled to $5,054,805, the full amount of gross sales reflected

in the record.

> 2. Lost Profits

Having established bad faith and intentional deceptiveness,

Plaintiffs are also eligible to receive damages in the form of

profits they would have earned in the absence of Defendants'

infringing activity.  See, e.g., GTFM, 215 F. Supp. 2d at 304-

05.  Plaintiffs' expert calculates that Tory Burch would have

made $51,800,706 in profits had all of Defendants' customers

purchased equivalent genuine products from Tory Burch.

Plaintiffs also argue on the basis of survey evidence that from

25% to 53% of relevant consumer populations confuse genuine Tory

Burch products with Defendants' infringing ones, depending upon

the consumer group and infringing design.  Given these results,

Plaintiffs request 53% of the amount of lost profits assuming

100% of lost sales, or $27,454,374.  Defendants have offered no

admissible expert opinion to rebut Plaintiffs' calculations of

their lost profits or critique Plaintiffs' survey methodology.

The lay critiques of survey methodology in Defendants'

opposition memorandum are both unsubstantiated and unpersuasive,

and the Court finds that the survey's results are sufficiently reliable to serve as a basis for calculating damages.

Nevertheless, Plaintiffs' estimate that 53% of customers would have purchased Tory Burch products is an optimistic one. Any award of lost profits, moreover, must be determined "subject to the principles of equity."  15 U.S.C. § 1117(a).  The appropriate quantum of lost profit damages here is that which Plaintiffs have calculated using a more conservative estimate of consumer confusion: 25%.  Tory Burch is therefore entitled to 25% of $51,800,706 in lost profits, or $12,950,176.50.

### 3. Treble Damages

The Lanham Act requires that, in the absence of "extenuating circumstances," any damage award be trebled "if the violation consists of . . . intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark."  15 U.S.C. § 1117(b)(1).  Because Defendants' conduct was intentional, Plaintiffs are entitled to treble damages on either a disgorgement or lost profit theory of recovery.  Defendants have offered no evidence of extenuating circumstances.  The amount of trebled disgorgement damages are thus $15,164,415.00; trebled lost-profit damages are $38,850,529.50.  Defendants are entitled to either.

4. Statutory Damages

The Lanham Act also provides that, "at any time before final judgment is rendered by the trial court," plaintiffs may elect an award of statutory damages in lieu of profits and damages.  15 U.S.C. § 1117(c).  Once liability is established, "if the court finds that the use of the counterfeit mark was willful," it may award up to "$2,000,000 per counterfeit mark per type of goods or services sold . . . as the court considers just."  Id. § 1117(c)(2).  Statutory damages are intended "not merely [to] compel[] restitution of profit and reparation for injury but also [are] designed to discourage wrongful conduct." N.A.S. Imp., Corp. v. Chenson Enterprises, Inc., 968 F.2d 250, 252 (2d Cir. 1992) (Copyright Act); see also Coach, Inc. v. Zhen Zhen Weng, No. 13cv445 (AJS), 2014 WL 2604032, at *18 (S.D.N.Y. June 9, 2014) ("Congress intended the statutory damages under 15 U.S.C. § 1117(c) to both compensate and deter.").  The parties agree that there are four categories of goods at issue, but disagree as to whether imposing the maximum amount of statutory damages -- two marks times four goods, or $8,000,000 -- is warranted here.

When considering an award of statutory damages under the Lanham Act, courts in this District have imported from copyright law a multifactor test, first articulated by the Second Circuit in Fitzgerald Pub. Co. v. Baylor Pub. Co., 807 F.2d 1110, 1117

(2d Cir. 1986).[6]  See, e.g., Tiffany (NJ) LLC v. QI Andrew, No.
10cv9471 (KPF) (HBP), 2015 WL 3701602, at *11 (S.D.N.Y. June 15,
2015) (citing cases).  In this case, however, two factors are so
salient as to be dispositive: the willfulness or innocence of
defendants' conduct and the interests of deterring other would-
be infringers.  Given the brazenness of Defendants' conduct and
the interests of discouraging such flouting of the trademark
laws in the future, Defendants are entitled to $8,000,000, the
maximum amount of statutory damages available.[7]

    5. Interest

    Plaintiffs seek both pre- and post-judgment interest on any
damages award, and Defendants do not oppose an award of
interest.  Prejudgment interest is expressly permitted when

---

[6] Under Fitzgerald, courts look to factors such as: (i) "the
expenses saved and the profits reaped"; (ii) "the revenues lost
by the plaintiff"; (iii) "the value of the copyright"; (iv) "the
deterrent effect on others besides the defendant"; (v) "whether
the defendant's conduct was innocent or willful"; (vi) "whether
a defendant has cooperated in providing particular records from
which to assess the value of the infringing material produced";
and (vii) "the potential for discouraging the defendant."
Fitzgerald, 807 F.2d at 1117.

[7] In arguing against maximum statutory damages, Defendants resort
to relying upon arguments that the Court has already rejected.
Defendants again contend -- contrary to the factual record and
the Liability Opinion -- that they were the first to use the
designs at issue.  They also argue that they "cooperated, to the
tune of thousands and thousands of pages, with Discovery
requests," blithely ignoring that an untold number of those
pages contained fabrications and fictions intended to pull a
fast one on Plaintiffs and the Court.

damages are trebled under § 1117(b).[8]  The interest rate is fixed
as the rate "established under section 6621(a)(2) of Title 26."
That rate, in turn, is the sum of the "Federal short-term rate"
determined by the Secretary of the Treasury, plus three
percentage points.  26 U.S.C. § 6621(a)(2).  The § 6621(a)(2)
interest rate from May 31, 2013, the date Plaintiffs filed their
complaint, through the date of judgment has been a flat 3%.  See
U.S. Dept. of Lab., IRC 6621 Table of Underpayment Rates,
http://www.dol.gov/ebsa/calculator/interestratetables.html (last
visited June 12, 2015).  Accordingly, Plaintiffs are awarded
pre-judgment interest of 3%.

Post-judgment interest is awarded on any money judgment
recovered in a civil case.  See 28 U.S.C. § 1961.  Post-judgment
interest is measured "from the date of the entry of the
judgment, at a rate equal to the weekly average 1-year constant
maturity Treasury yield . . . for the calendar week preceding
the date of the judgment," "computed daily to the date of
payment" and "compounded annually."  Id. § 1961(a)-(b).
Accordingly, Plaintiffs shall be awarded post-judgment interest

---

[8] In the absence of trebled damages, "[a]lthough Section 1117(a)
does not provide for prejudgment interest, such an award is
within the discretion of the trial court and is normally
reserved for exceptional cases."  Merck, 760 F.3d at 263-64
(citation omitted).

in an amount to be determined according to the statutory
formula.

B. Attorneys' Fees

On November 21, 2014, Plaintiffs moved for partial
attorneys' fees and costs as sanctions for Defendants'
misconduct.  Plaintiffs have also applied, in their motion of
March 3, 2015, for an award of the balance of their fees
pursuant to the Lanham Act.

1. Attorneys' Fees as Court Sanction

Plaintiffs' November 21 Fees Motion, seeking only those
fees and costs that were incurred in connection to Defendants'
fraud and bad-faith counterclaims, is considered made pursuant
to Federal Rule of Civil Procedure 11(c)(4) and the inherent
powers of the Court.[9]  Rule 11(c)(4) permits a court, upon motion
of a party, and if "warranted for effective deterrence," to
issue "an order directing payment to the movant of part or all
of the reasonable attorney's fees and other expenses directly
resulting from [a] violation."  Rule 11(c)(4), however, relates
only to papers filed with the court.  See Fed. R. Civ. P. 11(b).
For acts of fraud performed outside the court, a "federal

---

[9] Although the grounds for sanctions were not explicitly
identified in the Fees Motion, the Court explained at the
November 5 sanctions hearing that it was invoking Rule 11 and
its inherent authority in imposing sanctions.

court[] may exercise its inherent power to sanction a party or an attorney who has acted in bad faith." Ransmeier v. Mariani, 718 F.3d 64, 68 (2d Cir. 2013); see Chambers v. NASCO, Inc., 501 U.S. 32, 50 (1991) ("[I]f[,] in the informed discretion of the court," sanctions are warranted but not explicitly authorized by statute or Rule, "the court may safely rely on its inherent power." ).

Pursuant to the Court's further Order of January 16, Plaintiffs submitted detailed, topic- and attorney-specific documentation of the fees requested; these summaries supplemented information already submitted about the attorneys whose fees were claimed.  This initial request, as adjusted, amounted to $1,394,590.71 in fees and $82,077.71 in costs. Given the pervasiveness and bad faith of Defendants' conduct throughout the course of this litigation, an award of attorneys' fees and costs are plainly warranted as sanctions under Rule 11 and the inherent power of the Court.

2. Lanham Act Attorneys' Fees

Plaintiffs now request the balance of their attorneys' fees in this matter -- $1,456,614 -- pursuant to two provisions of the Lanham Act: 15 U.S.C. § 1116(b), which provides that reasonable attorneys' fees must be awarded in cases of intentional counterfeiting, and 15 U.S.C. § 1117(a), which "authorizes the award of attorney's fees to prevailing parties

in 'exceptional cases,' which [is] understood to mean instances of fraud or bad faith."  Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317 F.3d 209, 221 (2d Cir. 2003).

Bad faith, however, is only a "prerequisite to a finding that a case is sufficiently 'exceptional' to warrant an award of fees," Louis Vuitton, 676 F.3d at 108, and "the statute provides only that the district court 'may' award attorneys' fees." Patsy's Italian Rest., Inc. v. Banas, 658 F.3d 254, 268 (2d Cir. 2011).  Although this Circuit has not defined "exceptional" in this context, the Supreme Court's recent construction of an identically worded provision of the patent laws, 35 U.S.C. § 285, offers guidance.  There, the Court held that "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position . . . or the unreasonable manner in which the case was litigated."  Octane Fitness, LLC v. ICON Health & Fitness, Inc., 134 S. Ct. 1749, 1756 (2014).  A "case-by-case exercise of [] discretion, considering the totality of the circumstances," determines whether a case is "exceptional."  Id.  The Court further suggested that factors considered under a similar provision in copyright law -- "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case)," and the interests of compensation and deterrence -- were relevant to the inquiry.  Id. at 1756 n.6

(citing <u>Fogerty v. Fantasy, Inc.</u>, 510 U.S. 517, 534 n.19 (1994)).

By these or indeed any measures this case is exceptional. Defendants engaged in intentional infringement, perpetrated fraud and spoliation, pursued counterclaims grounded in that fraud, and have continued to sell their infringing merchandise throughout this litigation, all with the intent to deceive and profit at the expense of the administration of justice. Indeed, "courts in this District typically award Lanham Act fees based on extreme misconduct during litigation." <u>Beastie Boys v. Monster Energy Co</u>., 2015 U.S. Dist. LEXIS 77185, at *29 (S.D.N.Y. June 15, 2015) (emphasis omitted) (citing cases). Plaintiffs are therefore entitled to reasonable attorneys' fees both in connection with their motion for sanctions and under both provisions of the Lanham Act.

3. Legal Standard for Attorneys' Fees

In calculating attorney's fees, a district court must first determine the "lodestar -- the product of a reasonable hourly rate and the reasonable number of hours required by the case -- [which] creates a presumptively reasonable fee." <u>Stanczyk v. City of New York</u>, 752 F.3d 273, 284 (2d Cir. 2014) (citations omitted). A court must therefore consider (1) "what hourly rate would normally be charged in the pertinent legal community for similar cases by attorneys [with comparable] training and

experience" and (2) "how many hours were reasonably required for the prosecution of [the] claims." Orchano v. Advanced Recovery, Inc., 107 F.3d 94, 99 (2d Cir. 1997).  District courts have "considerable discretion in determining what constitutes reasonable attorney's fees in a given case," given their "superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." Matusick v. Erie Cnty. Water Auth., 757 F.3d 31, 64 (2d Cir. 2014).

"[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." Hensley v. Eckerhart, 461 U.S. 424, 437 (1983).  To aid in calculating the lodestar, the fee applicant must provide contemporaneous time records, affidavits, and other materials to support its application for the amount of reasonable hours expended. McDonald v. Pension Plan of the NYSA-ILA Pension Trust Fund, 450 F.3d 91, 96 (2d Cir. 2006). Additionally, "[w]here the documentation of hours is inadequate, the district court may reduce the award accordingly." Hensley, 461 U.S. at 433.  Fee requests should also be reduced to exclude hours that are not "reasonably expended," such as those that are excessive or redundant.  Id. at 434 (citation omitted).

The reasonableness of Plaintiffs' fees will first be assessed with reference to the Fees Motion and Plaintiffs'

detailed supplementary submissions of January 30, 2015.  The
balance of attorneys' fees claimed under the Lanham Act in the
Damages Motion will then be discussed.

       4. Reasonableness of Claimed Hourly Rates

    A reasonable hourly rate is "what a reasonable, paying
client would be willing to pay, given that such a party wishes
to spend the minimum necessary to litigate the case
effectively." Bergerson v. N.Y. State Office of Mental Health,
Cent. N.Y. Psychiatric Ctr., 652 F.3d 277, 289 (2d Cir. 2011)
(citation omitted).  Determining a reasonable hourly rate is a
"case-specific inquiry into the prevailing market rates for
counsel of similar experience and skill to the fee applicant's
counsel," and may include "judicial notice of the rates awarded
in prior cases and the court's own familiarity with the rates
prevailing in the district," Townsend v. Benjamin Enters., Inc.,
679 F.3d 41, 59 (2d Cir. 2012) (citation omitted), as well as
consideration of the "evidence proffered by the parties."
Farbotko v. Clinton Cnty., 433 F.3d 204, 209 (2d Cir. 2005).
The burden is on the fee applicant to show "by satisfactory
evidence -- in addition to the attorney's own affidavits -- that
the requested hourly rates are the prevailing market rates."
Id. (citation omitted).

i. Principals' Hourly Rates

The Fees Motion seeks an award of attorney's fees for principals Natalie L. Arbaugh, Lisa M. Martens, and Kristen McCallion, who currently bill rates of $725, $725, and $720, respectively. Defendants request that these rates all be reduced to $600, although beyond an apparent back-of-the-envelope average of rates in comparable cases their justification for the reduction is unclear. Tory Burch, in turn, cites numerous cases from this District in support of their claimed hourly rates.

Counsel's skill and expertise has been evident throughout this litigation, and their performance under taxing circumstances has been impressive. The Court finds that the partners' rates, while somewhat higher than the norm, are reasonable under the circumstances and generally consistent with prevailing rates for experienced partners in intellectual property cases in this District. See, e.g., Beastie Boys, 2015 U.S. Dist. LEXIS 77185, at *53 (average rates of $675 and $676.53/hour); Regulatory Fundamentals Grp. LLC v. Governance Risk Mgmt. Compliance, LLC, No. 13cv2493 (KBF), 2014 WL 4792082, at *3 (S.D.N.Y. Sept. 24, 2014) ($692.75/hour); Sub-Zero, Inc. v. Sub Zero NY Refrigeration & Appliances Servs., Inc., No. 13cv2548 (KMW) (JLC) 2014 WL 1303434, at *6 (S.D.N.Y. Apr. 1, 2014) ($785/hour and $485/hour for intellectual property

practice partners with considerable litigation experience);

Union of Orthodox Jewish Congregations of Am. v. Royal Food

Distributors Liab. Co., 665 F. Supp. 2d 434, 437 (S.D.N.Y. 2009)

($735/hour); GAKM Res. LLC v. Jaylyn Sales Inc., No. 08cv6030

(GEL), 2009 WL 2150891, at *8 (S.D.N.Y. July 20, 2009)

($650/hour reasonable for partner with 19 years' experience).

          ii. Associates' Hourly Rates

     The Fees Motion also requests reimbursement for two

associates' work:  Michael A. Bittner and Michael Gaddis.

Courts in this District have observed that rates of $390 to $470

"fall at the very top of the spectrum of reasonable hourly rates

for associates" in a trademark action.  Malletier, 687 F. Supp.

2d at 361; see also Sprint Commc'ns Co. L.P. v. Chong, No.

13cv3846 (RA), 2014 WL 6611484, at *7 (S.D.N.Y. Nov. 21, 2014)

(rate of $375 for associate in trademark infringement action

"exceeds or is at the upper end of what some courts in New York

are willing to award to an associate in similar cases").  This

Court has previously approved a rate of $430 for a fourth-year

Fish & Richardson associate.  Bissoon, 2010 WL 2404317, at *5.

     Michael A. Bittner is an associate in Fish & Richardson's

Dallas office "with nearly a decade of commercial litigation and

trial experience."  Mr. Bittner received his J.D. in 2008 and

clerked for the Honorable David Folsom of the Eastern District

of Texas from 2008-09, thus giving him, at most, six years of

experience as a practitioner.  Mr. Bittner's hourly rate in 2014 was $650.  Michael Gaddis is also an associate in the Dallas office of Fish & Richardson.  He was a summer associate in 2008 and, before joining the firm full-time, clerked for the Honorable Ed Carnes of the United States Court of Appeals for the Eleventh Circuit, thus giving him at most approximately four years of experience as a practitioner.  Mr. Gaddis's hourly rate in 2014 was $595.

In light of prevailing market rates in this District, Tory Burch's proposed rates for Mr. Bittner and Mr. Gaddis will be reduced.  Indeed, $650 and $595 both considerably exceed amounts recently found reasonable for associates in intellectual property actions in this District.  See, e.g., Saks Inc. v. Attachmate Corp., No. 14cv4902 (CM) (RLE), 2015 WL 2358466, at *4 (S.D.N.Y. May 15, 2015) (approving rates of $450 for associates with 4 years' experience); see also Beastie Boys, 2015 U.S. Dist. LEXIS 77185, at *54 ("Rates between $461 and $505 per hour are higher than those typically approved for associates in this district.").  Plaintiffs have failed to "bear the burden of justifying the upward deviation." Beastie Boys, 2015 U.S. Dist. LEXIS 77185, at *54.  Defendants propose reducing these rates to $400 per hour.  Given the nature and volume of the work occasioned by defendants' misconduct, the

Court finds that adjusted rates of $500 for Mr. Bittner and $450 for Mr. Gaddis are reasonable in this case.

### iii. Other Employees' Hourly Rates

The Fees Motion also seeks fees for a third Fish & Richardson associate and a case manager. Nancy Ly is a trademark and copyright associate who "supported the principals and senior associates on this case since the beginning, and has handled virtually every aspect of this case." Her hourly rate in 2013 was $200 and $305 in 2014. Defendants argue that rates for "other attorney[s]" be reduced to $300. Because Ms. Ly's proposed rates are commensurate with -- and in the case of $200, lower than -- prevailing market rates for associates in this District, they are reasonable. See, e.g., Sprint Commc'ns, 2014 WL 6611484, at *8 (finding $335 reasonable rate for associate in trademark action).

Neil Ramsaroop is a Litigation Case Manager at Fish & Richardson and "has worked as a paralegal for nearly two decades." His hourly rate in 2014 was $245. Defendants request that his rate be reduced to $150 per hour. The rate of $245, however, is reasonable in light of the work Ramsaroop performed and in comparison to rates for paralegals in this District as well as previous awards by this Court. See Bissoon, 2010 WL 2404317, at *5 (finding $285 rate reasonable for Litigation Case Manager who "oversaw the work of the paralegals in [the] case,

34

and assisted in gathering evidence"); see also Sprint Commc'ns, 2014 WL 6611484 at *8 (finding hourly rates of $205, $185 and $180 reasonable for paralegals).

>    5. Reasonableness of Claimed Hours

"Applications for fee awards should generally be documented by contemporaneously created time records that specify for each attorney[] the date, the hours expended, and the nature of the work done." Matusick, 757 F.3d at 64 (citation omitted). "Hours that are excessive, redundant, or otherwise unnecessary are to be excluded" from the tally. Kirsch v. Fleet St., Ltd., 148 F.3d 149, 173 (2d Cir. 1998) (citations omitted). If it finds excessive hours, a court has "discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application." Id. Similarly, records or other documentation that "are too vague to sufficiently document the hours claimed" may also warrant a reduction in hours claimed. Barclays Capital Inc. v. Theflyonthewall.com, No. 06cv4908 (DLC), 2010 WL 2640095, at *4 (S.D.N.Y. June 30, 2010) (citing Kirsch, 148 F.3d 149, 172–73). This may include the practice of "block billing," although block billing may be adequate if "the reasonableness of the work performed can still be confirmed." Id. at *5; see also Merck, 760 F.3d at 266 (affirming district court's conclusion that block billing was reasonable form of documentation).

Defendants argue that Plaintiffs' documentation, which uses block billing, are neither specific nor clear enough to support the number of hours claimed.  They argue that recording work by "blocks," many of which have "vague descriptions," makes it impossible to determine what portion of each entry's hours Defendants are actually claiming.  Defendants' supplementary submissions, however, make quite clear which compensable fees correspond to which category of sanctioned conduct.  More generally, reviewing challenged entries "in the context of the billing records that surround them" and the litigation as a whole has allowed the Court to "determine the reasonableness of the work performed."  U.S. ex rel. Fox Rx, Inc. v. Omnicare, Inc., No. 12cv275 (DLC), 2015 WL 1726474, at *3 (S.D.N.Y. Apr. 15, 2015) (citation omitted); Barclays Capital Inc., 2010 WL 2640095 at *4.  The entries are "not so vague as to frustrate review," Barclays Capital Inc., 2010 WL 2640095 at *5; indeed they almost invariably specify the topic or object of research, drafting, conferring, or preparation.

Defendants also argue that Tory Burch's time records "show that there was an unnecessary multiplication of time (and therefore fees) caused by the constant 'confer[ring]' among the various attorneys representing Tory Burch."  Contrary to Defendants' suggestion, there is nothing per se objectionable about claiming attorneys' fees for collaborative work.  Having

reviewed the records here, the Court finds no "unnecessary multiplication of time" in Fish & Richardson's claimed hours for "conferring" or any other collaborative activity.  The bulk of the work was performed by one partner and one associate.  The division of responsibility appears reasonable and prudent.

The following table summarizes the attorneys' fees awarded in connection with Plaintiffs' motion for sanctions.  (Hourly rates marked with asterisks changed during the course of litigation; while the higher figure is displayed, the correct rates were used in calculating fees.)

| Attorney | Hourly Rate | Hours | Total Awarded |
|----------|-------------|-------|---------------|
| Arbaugh | 725* | 770.8 | $555,175.50 |
| Martens | 725* | 152.8 | $109,864.00 |
| McCallion | 720 | 161.8 | $116,496.00 |
| Bittner | 500 | 670.7 | $335,250.00 |
| Gaddis | 450 | 14.1 | $6,345.00 |
| Ly | 305* | 308.8 | $93,522.50 |
| Ramsaroop | 245 | 230.7 | $56,521.50 |
| TOTAL | – | 2,309.7 | $1,273,174.50 |

6. Fees Claimed Under the Lanham Act

Plaintiffs move for the balance of their fees pursuant to 15 U.S.C. § 1117(a)-(b).  The total amount sought under the Lanham Act is $1,456,614.  In support of that request, Plaintiffs submit their counsel's complete client billing records from January 1, 2013 through February 10, 2015, as well as "clean copies" of their billing records from July 1, 2013 through November 14, 2014, which were previously submitted in

reduced form for purposes of obtaining attorneys' fees related
to sanctions.  Defendants argue that these rates are
unreasonable for the same reasons as described above.

Unfortunately, because of deficiencies in the documentation
supplied, it is difficult to evaluate the reasonableness vel non
of Plaintiffs' request for the balance of their fees under the
Lanham Act.  The new time records do not provide hourly totals
for each of the additional attorneys and paralegals involved,
although the Court's request for summary statistics and
attorney-specific information relating to the previous motion
made clear that information presented in that manner was
essential to determine reasonableness.  Nor did Plaintiffs
provide any information at all on over a dozen partners,
associates, and paralegals whose work is described in the fee
requests, and whose rates range anywhere from $115 to $795 per
hour.  In this District, "[w]here the moving party fails to
provide information on [] attorneys' and paralegals' backgrounds
and experience, courts have used their discretion to award fees
at a rate lower than requested."  Malletier, 687 F. Supp. 2d at
362 (S.D.N.Y. 2010).  Moreover, "in cases in which substantial
numbers of voluminous fee petitions are filed, the district
court has the authority to make across-the-board percentage cuts
in hours."  In re Agent Orange Prod. Liab. Litig., 818 F.2d 226,
237 (2d Cir. 1987).

Given that the reasonableness vel non of the Lanham Act fee requests cannot be adequately assessed -- and, what's more, given the considerable recovery Plaintiffs are being awarded in this case -- it is appropriate here to apply an across-the-board cut of 30% to the balance of the attorneys' fees sought. Accordingly, Plaintiffs' Lanham Act fee award is $1,019,629.80. Combined with fees awarded in connection to their motion for sanctions, the total amount of attorneys' fees awarded is $2,292,804.30.

C. Costs

In their November 21, 2014 motion for attorneys' fees and costs, Plaintiffs request $97,578.63 in costs, including costs of forensic experts, translation and travel services, settlement and mediation services, depositions, and other miscellaneous expenses. Defendants have presented a few arguments against a handful of specific costs claimed; none is persuasive. Accordingly, the request is granted.

Plaintiffs now move for the balance of their costs pursuant to 15 U.S.C. § 1117(a), and their request to submit a bill of costs is unopposed. Accordingly, pursuant to Local Rule 54.1, Plaintiffs shall submit a bill of costs to the Clerk of Court within 30 days of the final disposition of Defendants' appeal or, if no appeal is taken, within 30 days of the entry of final judgment. Defendants may then file objections to costs with the

Clerk.  Once the Clerk's award is issued, Defendants may appeal
it to this Court within seven days.  Fed. R. Civ. P. 54(d)(1);
see Whitfield v. Scully, 241 F.3d 264, 269 (2d Cir. 2001).

D. Injunctive Relief

Defendants did not oppose the entry of a permanent
injunction or an order to withdraw their trademark application.
They did not, moreover, object to the language in Plaintiffs'
proposed judgment, submitted with their Damages Motion, thereby
waiving any such objection.  See Barrientos v. 1801–1825 Morton
LLC, 583 F.3d 1197, 1215 (9th Cir. 2009) ("[Defendant] did not
object to the scope of the injunction before the district court
and, therefore, has waived the objection.").  Accordingly,
because the facts of this case patently satisfy the applicable
four-factor eBay standard, the Court issued a Partial Judgment
on June 11, 2015 granting the requested equitable relief
pursuant to 15 U.S.C. § 1116.

**CONCLUSION**

Plaintiffs' September 29, 2014 motion to exclude Keegan's expert report, November 21, 2014 motion for attorneys' fees and costs, February 27, 2015 motion for relief under the Lanham Act, and March 30, 2015 motion to strike certain evidence are granted.  Plaintiffs shall submit by July 3 a proposed final judgment incorporating their election of damages.


SO ORDERED:

Dated:     New York, New York
           June 25, 2015

                                _____
                                 DENISE COTE
                     United States District Judge